UNITED STATES of America

v.

Michael SESSA, Victor Orena and Pasquale Amato, Defendants.

No. CR 92–351.

United States District Court, E.D. New York.

May 25, 1993.

Mary Jo White, U.S. Atty., Brooklyn, NY by George Stamboulidis, Andrew Weissmann, for Government.

David Wikstrom, New York City, for Mr. Sessa.

Gustave H. Newman, New York City, for Mr. Orena.

Benjamin Brafman, New York City, for Mr. Amato.

## AMENDED SENTENCING MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge:

Defendants Michael Sessa, Victor Orena and Pasquale Amato were indicted together for racketeering, loansharking and firearms offenses committed while conducting the affairs of the Colombo organized crime "fami-

ly" and warring over its leadership. They were tried separately to protect them against possible prejudice. Each was convicted of all charges.

Statutorily mandated considerations of general deterrence and incapacitation, 18 U.S.C. §§ 3551 and 3553, require a life sentence and high fines for each defendant. The Guidelines are consistent in mandating terms of life imprisonment and substantial fines.

## I. FACTS

Organized crime mobs have thrived within New York City since the beginning of this century. Their names, numbers and leadership have shifted over time. The structure of "La Cosa Nostra" (meaning "this thing of ours") has remained the same. Each mob has an administration consisting of a boss, an underboss and a "consigliere," or counselor. This administration presides over a network of crews. Each crew is headed by a "capo," or captain, and is made up of numerous soldiers. The soldiers and captains carry out most of the criminal activities, funnelling much of the proceeds up to the administration.

The crimes from which these mobs produce their income include robbery, arson, insurance fraud, illegal gambling, corruption of labor unions, extortion, loansharking and drug dealing. Murder frequently is committed to enforce the internal rules of conduct and as part of struggles for control within and among the mobs. These rules include the requirements of maintaining silence about the organization's activities, refraining from harming law enforcement officers, declining to deal in drugs or counterfeit currency and refraining from harming another member without the approval of the "Commission." The Commission, which meets secretly and infrequently, consists of the leadership of all the organized mobs in New York City.

Discipline has eroded in recent years. Many of the formerly ironclad rules, such as the prohibition against narcotics commerce, are now violated with impunity. The rules limiting the use of internecine violence have been flouted, resulting in bloody battles and the shooting of bystanders. Perhaps most significantly, the code of silence that sealed the mobs off from penetration by law enforcement, is dissolving. Members now frequently testify against their former associates. For example, at the trials of these defendants, the juries learned about the operations of La Cosa Nostra from members of the Colombo family itself, from the former acting boss of the Luchese family and from the former consigliere of the Gambino family.

The powerful influence of these gangs in New York City was illustrated during these trials. The accomplice witnesses spoke of their own youthful aspirations to become organized crime soldiers, of the long period of apprenticeship and the sponsorship required before membership could be achieved and of the solemn, secretive ceremony by which new members take their oath and mix their blood with that of the mob's boss, pledging eternal loyalty, silence and obedience to all orders including the directive to kill a fellow member.

Alphonse D'Arco, the one-time acting boss of the Luchese family, noted that he was proudly present when his son Joseph was made a member despite being warned by the family's consigliere that from then on Anthony Casso, the Luchese family's boss, "owned" his son. That same son was later a threat to his own father's life. D'Arco sadly reflected on the witness stand that both he and others had been lured into organized crime by the ethos of the neighborhood as young twigs bent by their seniors. Defendant Victor Orena's own sons were referred to frequently in the testimony as aides to their father in the affairs of the Colombo mob.

The Colombo division of organized crime is one of five now operating in New York City. It is a lucrative enterprise. Its stock-in-trade is loansharking. Members of the various crews loan funds at extortionate rates of interest, usually in the neighborhood of 100 to 250 percent per year, and enforce the terms of those loans with threats of violence. A portion of the proceeds of these loans, termed "vigorish" or "vig," is shared with the higher-ups within the organization. The

mob's illegal gambling operations work in tandem with this financing scheme.

Like the other New York City criminal mobs, the Colombos have profited from the control of labor unions. This activity depends upon the cooperation of corrupt union officials. Typically the organized crime families will assist contractors who wish to avoid utilizing union labor by guaranteeing "labor peace" in exchange for a fee which is then shared with the corrupt union leaders.

The crime mobs frequently work together in this activity. For example, the Colombo and Luchese mobs each controlled a concrete company. As cement was offloaded at the docks, the mobs would keep track of how much went to each company. Each mob received a payment per yard of concrete that went to its own company. These payments were extracted in exchange for the guarantee of the mob to maintain peace with the labor unions involved in the concrete business.

The Gambino and Colombo mob capitalized on their control of labor unions in connection with the pouring of foundations for Navy and other housing on Staten Island. The Gambino family controlled the two major concrete companies on Staten Island. The price of the concrete was inflated by five dollars per yard, with one dollar per yard going back to the company and the other four being shared by the Gambinos and Colombos. Control of the unions involved in the concrete business by the two mobs ensured that no other concrete companies could operate on Staten Island, which was described by Salvatore Gravano, the former consigliere of the Gambinos, as a "gold mine."

The Luchese and Colombo mobs profited in connection with a project to dismantle the West Side Highway in Manhattan. The Luchese group arranged a "sweetheart" contract for movement of scrap steel between the dock workers union, controlled by the Colombo group, and the construction company in charge of the project which wished to avoid dealing with the steel workers. The Luchese mob was to be paid $800,000 for its services in arranging the deal through the Colombos and maintaining peace with the steel workers.

The Luchese and Colombo mobs also profit by cooperating in the control of unions and the maintenance of labor peace in the shipping industry at Kennedy Airport. Four of the five mobs cooperated in obtaining shares of the criminal proceeds generated by Russian emigre organized crime groups that controlled a huge tax avoidance scheme in the gasoline industry.

Struggles for control of the Colombo mob have occurred frequently throughout its history. The present official boss of the Colombos, Carmine Persico, is serving prison sentences of 100 and 39 years imposed in 1986 and 1987. As a result of his absence, a contest for leadership developed between those loyal to Persico and those loyal to defendant Victor Orena whom Persico had appointed acting boss in 1988. Orena had attempted to parlay his temporary appointment into a permanent one, in violation of his agreement with Persico that Persico's son Alphonse would lead the family upon release from prison.

Sessa and Orena were responsible for many of the crimes for which they were convicted as part of the war that broke out when Orena attempted to seize control of the Colombos. Amato, while he had a less obvious role, participated as a trusted leader, and insider, in the gamut of crimes committed by the Colombo gang. Using scores of guns, police radios, bullet-proof vests, walkie-talkies, hideouts in New York and New Jersey, stolen cars, surveillance reports, and inside telephone records, the Colombos stalked each other. Were it not for the fact that the New York police and Federal Bureau of Investigation had bugged their cars and hideouts and frustrated many of their ambushes, the death toll would have multiplied. The recordings of their conversations as they rode out on their killing missions were terrifying in their inanity, calculated coldness and lack of respect for human life and even the dignity of death.

Each of these three defendants had an important role in the Colombo organized mob and in the war for its leadership. Each participated in the full range of crimes attributed to the mobs. Each was responsible for murders, conspiracies to murder, loanshark-

ing and other serious continuing crimes. While each defendant has undoubtedly amassed large sums of money, the government has not been able to trace most of their assets.

The evidence in this case and other cases tried in this court proves beyond any doubt that these defendants will not abandon their criminal activities and mob membership upon release from incarceration. They will try to participate in gang activities from prison. No matter how aged or infirm, they will continue to represent serious dangers to the community.

The close-knit and loving relationships of these defendants with their children, their spouses or their paramours do not take precedence over their continuing evil power and their urge to commit serious crimes. The court regrets the pain caused defendants' relatives by the harsh sentences that must be imposed; it is defendants' voluntary criminal acts that are responsible for their punishment.

## II. LAW

Responsibility to impose a just sentence rests with the district judge. Sections 3551 and 3553 of Title 18 of the United States Code principally control the functions of the sentencing judge. Section 3551 directs the court, where Congress has not provided specific sentencing requirements in the substantive law defining a particular criminal offense, to sentence the defendant

in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

Section 3553 describes the factors the court must weigh in sentencing. The statute directs the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). It then states that the court

shall consider—(1) the nature and circumstances of the offense and the history and

characteristics of the defendant [and] (2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

*Id.* Other factors the court "shall consider" in sentencing include the kinds and ranges of sentences found in the applicable Sentencing Guidelines, policy statements of the Sentencing Commission, the need to avoid sentencing disparity and the need to provide restitution to victims. *Id.* § 3553(a)(2), (4)–(7).

In addition to their mention in subsection (a)(4) of section 3553 as one of the factors that must be considered at sentencing, the Sentencing Guidelines are treated in subsection (b) of section 3553 as follows:

The court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) [of section 3553] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

The various statutorily enumerated factors can be harmonized and all given full force. *See United States v. Concepcion,* 795 F.Supp. 1262, 1275–81 (E.D.N.Y.1992). "As a first step, under sections 3551 and 3553(a), the court must consider how, given the circumstances of the case, the various purposes of sentencing can best be served." *Id.* at 1279. Any and all of the factors in section 3553(a), including the applicable guidelines, should be considered and weighed. A necessary part of this inquiry is the determination "whether the Sentencing Commission's Guidelines and Policy Statements ought to control a given

case to the exclusion of all other factors."
*Id.*

■ Run-of-the-mill cases that are "typical of many like situations and . . . susceptible to the statistical analysis and compilation techniques used by the Commission in developing the Guidelines," *id.*, should be handled primarily by reference to the Guidelines. Cases that, after careful weighing of the numerous statutory factors, appear to present unusual considerations or indicate the need to weigh one or a few factors especially heavily and, therefore, do not readily fit with the "heartland" approach of the Guidelines require careful individual consideration by the sentencing court under the guidance of the overall statutory scheme.

The statutory limits on sentencing for the crimes in the instant case are as follows: The racketeering counts carry maximum terms of life. 18 U.S.C. § 1963(a). The underlying substantive murder counts carry maximum terms of life. 18 U.S.C. § 1959(a)(1). The underlying conspiracy to murder counts carry maximum terms of ten years. 18 U.S.C. § 1959(a)(5). The maximum term for the loansharking conspiracy counts is 20 years. 18 U.S.C. §§ 892 and 894. The unlawful possession of firearms counts carry a maximum term of 10 years. 18 U.S.C. § 922(g)(1). For the counts charging use of a firearm in connection with a crime of violence, a term of five years imprisonment must be imposed consecutively to that for the other counts. 18 U.S.C. § 924(a)(1) and (c)(1). A fine of up to $250,000 may be imposed for each of these felony counts. 18 U.S.C. § 3571(b)(3).

## III. APPLICATION OF LAW TO FACT

Considerations of incapacitation and general deterrence overwhelm all other factors in the sentencing of Sessa, Orena and Amato. These are not quotidian cases. These mobsters, working within their own and with other mobs, have thrived in and cultivated a complex and pervasive culture of crime that infests and sucks dry entire communities and industries within this city and surrounding areas. Harsh terms of imprisonment are required to incapacitate defendants and extract them from the net of criminal activity in which they have been enmeshed for their adult lives and to which they no doubt would return at the first opportunity. Severe sentences may also by general deterrence save youngsters who might be seduced into the criminal lifestyle of these mobsters.

The testimony in these three trials detailed the highly organized, structured nature of the Colombo and other mobs. The pervasive influence of the organized crime mobs in many of the formerly great industries of New York was made clear. The drain on the city's human and economic resources caused by this criminal activity has been a major factor in the deterioration of our social, political and economic infrastructure. The history of these families—their steady growth and repeated struggles for power internally and with each other—demonstrate that they are tenacious and will not easily be defeated. The culture of crime is potent. Its adherents know no other way.

The direct and indirect costs of these gangs to the honest people of the metropolitan area are measured in the billions of dollars. Whole industries have been poisoned and adversely affected. Waterfront activities and traffic by ships, aircraft and trucks, building trades, garment trades, convention and theatrical facilities, restaurants and even politics are among the innumerable areas where these malefactors have operated. Using their loansharking and shakedown techniques they have gained control over numerous businesses, often driving them into bankruptcy and causing the loss of great numbers of jobs. The direct costs to taxpayers of police surveillance and prosecutions run into the millions. And, of course, many individuals have been killed, maimed, or prevented from living in the peace and tranquillity they were entitled to expect in our democratic society.

Incapacitation is the only means of preventing these defendants from perpetuating their criminal activity. Their past histories reveal them to be recidivists who cannot be rehabilitated. Their removal from society will prevent the further damage they are sure to cause and may have the added benefit of discouraging the inevitable successor

generation that seems to arrive as soon as its forebears depart.

The testimony at trial revealed the extent to which mob life is shared and inherited through real families. Accomplice witnesses detailed how young, impressionable males in the Italian–American community have been lured into the destructive life of these mobs before they are able to recognize the better opportunities available to them. While court records indicate that the gangs themselves constitute only a miniscule percentage of this hard-working and law-abiding community, their reputations and representativeness have been grossly inflated to the detriment of the entire group. And they still are role models for a small—and decreasing—number of young men. It is tragic that even a relatively few young people with great potential for law-abiding lives should emulate these defendants and their ilk. Even when the aura of the mob was bright most youngsters in this community escaped from poverty of ideas and aspirations through education and hard legitimate work. Now, with university open admissions policies and numerous role models—to name but a few, the Governor of New York, an Associate Justice of the United States Supreme Court and the former Chancellor of the New York City Schools and Dean of the Cardozo Law School—it is more important than ever to stamp out this baleful group of ruthless and cruel parasites who too often are mistakenly thought of as representing their community.

The task of rooting out these criminals is arduous. They must be removed one-by-one through burdensome and expensive prosecutions that amount to a guerilla war on organized crime. The increased number of members of gangs willing to testify and the deterioration in the quality of their leadership and membership does show the utility and efficiency of the tenacious and sometimes brilliant work of law enforcement agencies. The cost of these gangs to society, both in terms of dollars spent and in terms of the drag on human resources in our court system, preventing the smooth administration of civil justice, remains great.

Unrelenting pressure of hundreds of talented city, state and federal investigators over many years has now undermined the walls of secrecy surrounding these gangs. Many of their managing personnel now cooperate with the government. Sentences most severe are required if the final assaults on their citadels, while these gangs are disorganized and on the run, are to be successful. The tactics of Grant, not McClellan, are in order.

The Guidelines are of little assistance in these cases. They focus myopically on mechanical aspects of the offenses. Their formulaic scheme fails to account for the overall picture of these defendants developed during three trials and in three thorough and exhaustive presentence reports. These criminals must be punished in the proper context of their lives and their overall actions, not in the vacuum of "units," "offense levels" and "adjustments" created by the Guidelines.

These cases are extraordinary. Incapacitation and deterrence, 18 U.S.C. § 3553(a)(2)(B) and (C), far outweigh other factors encompassed by the statutes and Guidelines. All three defendants must be imprisoned for life. That the Guidelines require terms of life imprisonment demonstrates that appropriate sentences for these unusual defendants coincide with sentences meted out for those who have committed similar offenses in the past.

Severe fines must also be imposed. The proof relating to defendants' lifelong involvement in lending funds at annual rates of interest greatly exceeding 100 percent establishes beyond a reasonable doubt that they are concealing significant assets. The limited financial information gleaned by Probation undoubtedly underrepresents greatly the monies that defendants have squirreled away. They must reimburse society for the drain on economic resources caused by their lives of crime and for the high costs of their own necessary imprisonment.

## IV. SENTENCES

### A. Michael Sessa

Defendant Michael Sessa is sentenced to life in prison for the racketeering count. While there are serious theoretical questions about the racketeering conspiracy count,

based on a conspiracy to commit a conspiracy, it is not duplicitous under Second Circuit authority. *See United States v. Benevento,* 836 F.2d 60, 72–73 (2d Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); *United States v. Ruggiero,* 726 F.2d 913, 918–19 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). He is sentenced to life for the racketeering conspiracy count. He is sentenced to life for the underlying murder count, to ten years twice for the two murder conspiracy counts and to 20 years twice for the two loansharking counts. These prison terms are to run concurrently. As required by statute, he is sentenced to an additional consecutive term of five years for the firearm count. These terms are consistent with the Guidelines term of life.

Fines are imposed cumulatively at the rate of $250,000 per count, for a total of $2,000,000. Sessa also shall pay for the cost of his own imprisonment at the rate of $1,492 per month and a special assessment of $50 per count for a total of $400.

### B. *Victor Orena*

Defendant Victor Orena is sentenced to life in prison for the racketeering count and to life for the racketeering conspiracy count. He is sentenced to life for the underlying murder count, to ten years twice for the two murder conspiracy counts and to 20 years twice for the two loansharking counts. For the count charging illegal possession of firearms, he is sentenced to ten years. These terms are to run concurrently. As required by statute, he is sentenced to an additional, consecutive five years for the count charging use of a firearm in connection with a crime of violence. These terms are consistent with the Guidelines term of life.

Fines are imposed cumulatively at the rate of $250,000 per count, for a total of $2,250,000. Orena also shall pay for the cost of his own imprisonment at the rate of $1,492 per month and a special assessment of $50 per count for a total of $450.

### C. *Pasquale Amato*

Defendant Pasquale Amato is in a slightly different position from the other two defendants. He worked early and late driving an oil delivery truck, as a youth labored as a blacksmith at a race track, lived in a modest house, and had a wife who worked for wages. Moreover, he seems to have had a more peripheral role in the recent gang war among the Colombos. Nevertheless, the jury finding of guilt was fully supported by the evidence that he was a murderer and major criminal.

This defendant is sentenced to life in prison for the racketeering count and to life for the racketeering conspiracy count. He is sentenced to life for the underlying murder count, to ten years for the single murder conspiracy count and to 20 years twice for each of the two loansharking counts. For the count charging illegal possession of firearms, he is sentenced to a term of ten years. These terms are to run concurrently. They are consistent with the Guidelines term of life.

Fines are imposed consecutively at the rate of $250,000 per count, for a total of $1,750,000. Amato also shall pay for the cost of his own imprisonment at the rate of $1,492 per month and a special assessment of $50 per count for a total of $350.

## V. CONCLUSION

The sentences to the penitentiary are within the Guidelines. To the extent they exceed the Guidelines, the court has departed upward in view of the heinous nature of these offenses and the danger these defendants pose to the community. The court has also departed upward in connection with fines for the same reasons.

SO ORDERED.