**UNITED STATES OF AMERICA,**
Appellee,

v.

**Pasquale AMATO, Defendant–Appellant.**

**No. 573, Docket 93–1398.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 3, 1993.

Decided Jan. 19, 1994.

Andrew Weissmann, Assistant United States Attorney, Brooklyn, NY (Zachary W. Carter, United States Attorney for the Eastern District of New York, David C. James, Assistant United States Attorney, Brooklyn, NY, of counsel), for appellee.

Herald Price Fahringer, New York, NY (Diarmuid White, Benjamin Brafman, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, New York, NY, of counsel), for defendant-appellant.

Before: KEARSE, PIERCE, and JACOBS, Circuit Judges.

JACOBS, Circuit Judge:

Defendant Pasquale Amato appeals from a judgment entered following a jury trial in the United States District Court for the Eastern District of New York (Weinstein, J.), convicting him of all seven counts under a superseding indictment charging him with substantive and conspiracy violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d); murder and conspiracy to murder, 18 U.S.C. § 1959(a)(1), (5); conspiracy to make extortionate extensions and collections of credit (that is, loansharking), 18 U.S.C. §§ 892, 894; and illegal possession of a gun and ammunition, 18 U.S.C. § 922(g)(1). Amato was sentenced to life in prison on the murder and RICO counts, and the statutory maximum prison terms on the remaining counts, with the sentences to run concurrently. Amato was also fined $250,000 on each of the seven counts. 821 F.Supp. 870.

On appeal, Amato principally challenges the sufficiency of the loansharking evidence, and several evidentiary rulings regarding loansharking and internecine mob warfare. He also contends that the gun count should have been severed and that he was denied "individualized" sentencing. Finding no merit in his contentions, we affirm.

## I. BACKGROUND

In 1992, Pasquale Amato, Victor Orena, Carmine Sessa and Michael Sessa, members of the Colombo organized-crime family, were indicted on a variety of charges, including loansharking, the loansharking-related murder of Colombo family member Thomas Ocera, and various slayings and murder attempts related to a Colombo family internal dispute. A prior opinion of this court, familiarity with which is assumed, resulted from this prosecution. See United States v. Orena, 986 F.2d 628 (2d Cir.1993). Amato was tried separately. The following facts are drawn from the government's evidence at Amato's trial, which consisted primarily of testimony by four coconspirators, and court-authorized and consensual tape recordings. The four cooperating witnesses were Michael Maffatore and Harry Bonfiglio, who disposed of the body of Thomas Ocera; Joseph Ambrosino, a member of the Colombo family; and Alphonse D'Arco, the one-time acting boss of another crime family.

The senior members of the Colombo family, as in other mob families, consist of a boss, an underboss and a counselor. This administration runs a network of crews. Each crew is composed of a number of soldiers headed by a captain. Some of the soldiers are "made" members of the family, that is, formally sworn to allegiance in an induction ritual. Other soldiers are "associates" who for the most part are aspiring to become made members. The soldiers and captains carry out most of the criminal activities, channelling much of the proceeds to upper layers of the criminal hierarchy.

One of the principal income-generating activities of the Colombo family is loansharking. The cash capital for loansharking usually comes from the higher levels of command and is funnelled down through the captain to his crew members. A crew member lends money to a customer at extortionate rates of interest, commonly three to five percent per week, and enforces repayment with violence or threats of violence. The crew member retains only part of the interest payment, known as vigorish, and the remainder flows back up the chain of command.

During the early 1990s, the Colombo family was in upheaval because its boss, Carmine "Junior" Persico, was incarcerated and was being threatened with ouster by the acting boss Victor Orena, Amato's codefendant. Family members split into factions loyal to Persico or Orena, took up arms, and fought an internecine war. Amato had been a captain in the Colombo family since at least 1988 and was closely allied with Orena, at one point serving as his acting underboss. Although members of Amato's crew were caught up in the Colombo family internal dispute, Amato was not indicted for any of the ensuing carnage. According to trial testimony, members of Amato's crew included (i) Jack Leale, who, with Amato, killed Thomas Ocera for reasons apparently unrelated to the family dispute; (ii) Joseph "Joey" Amato (no relation), who ran a loansharking operation and was described as Amato's "right arm"; (iii) Robert Donofrio, who ran a loansharking operation to which Amato contributed $20,000; and (iv) Joseph Ambrosino, who testified against Amato at trial.

Thomas Ocera was a made member of the Colombo family. In addition to his loansharking activities, Ocera ran a restaurant called the Manor in Merrick, Long Island. There was evidence that Ocera may have been a member of Amato's crew, and that Amato contributed funds to Ocera's loansharking business. Amato and Leale met frequently with Ocera at the Manor in the morning before it opened.

On October 5, 1989, about a month before Ocera's death, the Suffolk County police executed a search warrant for the Manor, and seized Ocera's record books. Among these records was a datebook containing names and numbers that were shown at trial to be accounts of loans made and vigorish owed. Ocera tried and failed to get the police to return the datebook. Testimony provided by a manager at the Manor revealed that, in the month following the search, Ocera began to drink heavily and grew despondent, talking about how he expected to be killed. He and the restaurant manager received anonymous death threats, and, in one incident, were menaced by a car driven by a Colombo family soldier.

Early in November 1989, Victor Orena ordered Leale to kill Ocera, reportedly because Ocera was skimming money from the loansharking operation. On November 13, 1989, Leale lured Ocera to Amato's house. There, with Amato's help, Leale garroted Ocera and placed the body in the trunk of a car he had borrowed from his brother-in-law, Bonfiglio. Leale, assisted by (among others) his driver Maffatore and Bonfiglio, buried Ocera's body later that night in Forest Park, Queens. Amato did not appear at the Manor for his morning meeting with Ocera the next day or ever again. The day after the murder, in accordance with crime family practice, Leale was awarded Ocera's two gambling clubs. Bonfiglio and Maffatore, however, were not compensated, and grumbled in intercepted conversations about not receiving credit from Amato for helping to bury Ocera. Both eventually cooperated with law enforcement authorities and fingered Amato and Leale.

Directed to the spot by Maffatore, the FBI unearthed Ocera's remains on October 3, 1991, almost two years after the murder. An arrest warrant was issued for Leale. Four weeks later, he was found shot to death in a parking lot on Long Island. On January 31, 1992, the FBI searched Amato's home and seized a Davis Industries .380 gun and ammunition that had been purchased in the same consignment as guns found in the possession of other Colombo family members. By April 1992, the government had amassed enough evidence to indict Amato and Orena for Ocera's murder and for weapons possession. A superseding indictment added counts under the RICO and loansharking statutes, and also charged Orena and the

Sessas with slayings and murder attempts related to the Colombo family war. The charges against Amato were eventually severed and, in January 1993, he was convicted of all seven counts against him after a jury trial before the Honorable Jack B. Weinstein, who also presided at the jury trials of two of Amato's co-defendants.

## II. DISCUSSION

### A. Admissibility of Coconspirators' Statements Regarding Loansharking

Amato challenges two items of loansharking evidence as inadmissible hearsay: (1) the testimony of Ambrosino, an Amato crew member, that Donofrio told him that: Amato loaned Donofrio $20,000 in June 1991 at the rate of one percent per week, and Donofrio made two payments to Amato before suspending payments as a result of the Colombo family internal dispute; and (2) Ocera's loansharking records, conceded by Amato to be authentic, that were seized from the Manor by the Suffolk County police. We affirm the trial court's rulings that this evidence was not hearsay and was admissible under Fed. R.Evid. 801(d)(2)(E) as the statements of coconspirators.

To admit a coconspirator's statement under Rule 801(d)(2)(E), the trial court must first find by a preponderance of the evidence that the statement was made by a coconspirator of the defendant during the course of the conspiracy and in furtherance of it. *See United States v. Tracy*, 12 F.3d 1186, 1195–1196 (2d Cir.1993). The trial court's preliminary factual findings under Rule 801(d)(2)(E) will not be disturbed unless clearly erroneous. *United States v. Maldonado–Rivera*, 922 F.2d 934, 959 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). At issue is whether a preponderance of the evidence established that Donofrio and Ocera were participants with Amato in the Colombo family loansharking conspiracy, and if so, whether their statements and records implicating Amato were made during the course and in furtherance of the conspiracy. As to Amato's membership in the conspiracy, this standard was met by evidence that loansharking was a principal

activity of the Colombo family and that Amato was a captain in the family hierarchy.

As to Donofrio, Ambrosino testified that Donofrio engaged in loansharking. The evidence supported an inference that Amato, as Donofrio's captain and supervisor, was aware of Donofrio's loansharking activities, and that these activities were part of the Colombo family loansharking conspiracy. It was not clear error for the trial court to find that the conspiracy was continuing at the time Donofrio told Ambrosino about the $20,000 loan even though, at some point prior to this statement, Donofrio had abandoned Amato's crew and joined forces with an opposing faction in the Colombo family internal dispute. Rivalry and dissension, however violent, do not necessarily signify dissolution of a conspiracy. An internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it. *See United States v. Aracri*, 968 F.2d 1512, 1522 (2d Cir.1992) (acrimony among coconspirators did not negate finding of single conspiracy); *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir.1988) (competitive relationship of members of RICO conspiracy did not negate single conspiracy, but was evidence of participation in conspiracy), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).

The evidence also supported a finding that Donofrio's statement to Ambrosino was made in furtherance of the conspiracy because the statement apprised another member of the conspiracy of the status of a particular loan. "[S]tatements between coconspirators that may be found to be in furtherance of the conspiracy include statements that ... inform each other as to the progress or status of the conspiracy." *Maldonado–Rivera*, 922 F.2d at 958–59.

As to Ocera, the evidence supported a finding that he was a loanshark, and that he engaged in this business as part of the Colombo family loansharking conspiracy. His records listed the names of Colombo family members and payment amounts. The manager of Ocera's restaurant testified to meetings between Ocera and members of the Colombo family, including Amato. After the datebook was seized by the Suffolk County

police, Ocera made frantic efforts to retrieve it and he began to fear reprisals by Colombo family members. Testimony and recorded conversations established that Orena, acting boss of the Colombo family, ordered Ocera's murder in retaliation for loansharking misdeeds. Based on this evidence, it was not clear error to find that Ocera and Amato were coconspirators in the Colombo family loansharking conspiracy. "Once the government established by a preponderance of the evidence that there was a conspiracy in which both [the record keeper] and [the defendant] participated, ... it was entitled to introduce evidence of what any co-conspirator did in furtherance of the conspiracy, such as a record of [criminal] transactions, without showing more." *United States v. Calbas*, 821 F.2d 887, 893 (2d Cir.1987) (footnote omitted), *cert. denied*, 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988); *see United States v. Canieso*, 470 F.2d 1224, 1233 (2d Cir.1972) (letter properly admitted against defendant as declaration of coconspirator where there was "sufficient evidence, independent of the truth of [defendant's] letter alone, to prove [defendant's] participation in the conspiracy").

The evidence was also sufficient to find that Ocera's loansharking records were statements made in furtherance of the Colombo family conspiracy. It was a fair inference that the entries in Ocera's datebook were accounting records of loans, payments and vigorish—data necessary to monitor and conduct the loansharking operation. *See Maldonado–Rivera*, 922 F.2d at 959 ("in furtherance" element satisfied by statements in communiqué that discuss use of robbery proceeds and provide reassurance as to the status and solvency of the conspiracy); *United States v. McPartlin*, 595 F.2d 1321, 1351 (7th Cir.) (calendars admissible under Rule 801(d)(2)(E) because entries were made so that coconspirator could rely on them in carrying out his scheme), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

### B. Sufficiency of Evidence of Loansharking

Amato argues that the evidence was insufficient to prove his membership in the Colombo family loansharking conspiracy. He therefore seeks reversal of his convictions for conspiracy to make extortionate extensions and collections of credit, and of his RICO convictions, which are predicated on loansharking as one of the racketeering acts. "An appellant challenging the sufficiency of the evidence bears a very heavy burden." *United States v. Rivera*, 971 F.2d 876, 890 (2d Cir.1992). Viewing the evidence in the light most favorable to the government, and construing all possible inferences in its favor, we must affirm the conviction as long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in text); *see United States v. Harris*, 8 F.3d 943 (2d Cir.1993).

In view of the inherent secrecy of a conspiracy, we have set forth additional standards for assessing the sufficiency of evidence concerning the crime. The government need not present evidence of a formal or express agreement, but may rely on proof that the parties have a tacit understanding to engage in the offense. *Rivera*, 971 F.2d at 891 (citing *United States v. Rubin*, 844 F.2d 979, 984 (2d Cir.1988); *United States v. Wardy*, 777 F.2d 101, 107 (2d Cir.1985), *cert. denied*, 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986)). The elements of a conspiracy may be established by circumstantial evidence. *Rivera*, 971 F.2d at 890 (citing *United States v. Chang An–Lo*, 851 F.2d 547, 554 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980)). "Once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *Rivera*, 971 F.2d at 891 (quoting *United States v. Tutino*, 883 F.2d 1125, 1129 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990)).

Circumstantial and direct evidence was offered at trial to show Amato's participation in the loansharking conspiracy. Amato states on appeal that he does not "seriously dispute" that he was a member of the Colombo crime family. The evidence showed

that he was a high-level participant in the Colombo crime family, and that its staple business was loansharking. Amato lent $20,000 to his crew member Robert Donofrio at one percent per week as part of a loansharking operation. Joey Amato, an Amato crew member described as Pasquale Amato's "right arm," who at one time served at Amato's request as acting captain of the crew, was engaged in loansharking. Ocera maintained loansharking records which reflect regular payments to "Patty", "Pat" and "Pat A," diminutives of Pasquale Amato. Amato and Ocera had frequent, early morning meetings. One suggested motive for Ocera's murder, of which Amato was convicted, was that Ocera was skimming from the loansharking operation. The jury properly could have inferred from this evidence that Amato was a member of the Colombo family loansharking conspiracy, and that his role entailed funding loansharking transactions, collecting payments and vigorish on such loans, and supervising and disciplining crew members who engaged in loansharking. Viewing the pieces of evidence "not in isolation but in conjunction," *United States v. Khan,* 787 F.2d 28, 34 (2d Cir.1986), we find the evidence sufficient to convict Amato of conspiracy to engage in loansharking.

### C. Admissibility of Evidence of Mob Warfare and Joinder of the Weapons Count

■ Amato claims that he was unfairly and substantially prejudiced by the admission of evidence concerning the Colombo family internecine war between the Persico and Orena factions of the Colombo family. Amato concedes that the warfare evidence was properly admitted with respect to Count Seven of the indictment, which charged Amato with illegal possession of a gun and ammunition. He claims, however, that the weapons count should have been severed under either Rule 8(a) or Rule 14 of the Federal Rules of Criminal Procedure, in order to avoid prejudicial spillover.

The basis for the weapons possession count against Amato was a Davis Industries .380 gun and five rounds of .380 ammunition turned up during a search of Amato's residence in January 1992. Further investigation revealed that the gun found in Amato's house was one of a batch of six such guns purchased in Ohio on July 31, 1991. One of the other Davis Industries .380 guns was found in Joey Amato's possession and a third was found in the possession of an associate of another made member of the Colombo family.

Amato defended himself against the weapons count by arguing that he did not knowingly possess the gun and ammunition, which were not found on his person, but in his house. To prove such knowledge, the government was entitled to introduce evidence of the fact that guns from the same consignment as Amato's were found in the possession of fellow Colombo family members, and that these members were collectively motivated to acquire the guns because of a common peril—the Colombo family internecine war. The warfare evidence introduced for this purpose was limited, and cast Amato in the role of potential victim rather than active combatant.

The joinder of two or more offenses is permitted if they "are based on ... two or more acts or transactions connected together." Fed.R.Crim.P. 8(a). "Joinder is proper where the same evidence may be used to prove each count." *United States v. Blakney,* 941 F.2d 114, 116 (2d Cir.1991). In *Blakney,* a defendant was charged with selling both narcotics and firearms. The evidence showed that he sold both commodities to the same customers and attempted to barter one good for another. We held that "[t]he evidence in support of the two counts was thus interconnected, and the interests of judicial efficiency were served by having the counts tried together." *Id.*

In Amato's case, the evidence offered to prove the gun count—particularly the disputed element of knowing possession—was interconnected and overlapping with the evidence offered to prove the RICO, loansharking and murder counts. For all of these counts, the government needed to establish Amato's membership in the Colombo crime family, the structure and methods of the family's criminal operations, and Amato's relationship to other family members, including members who also possessed guns from the

single consignment of Davis Industries .380s. Indeed, the gun itself was evidence of Amato's membership in the Colombo family and could have been admitted to prove the RICO counts, even if those counts had been tried separately. Thus, considerations of economy and speed outweighed possible unfairness to Amato and justified the joinder of the gun count under Rule 8(a). *See United States v. Turoff,* 853 F.2d 1037, 1042 (2d Cir.1988) (Rule 8 "reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused"); *United States v. Werner,* 620 F.2d 922, 929 (2d Cir.1980) (same); *see also United States v. Orena,* 986 F.2d 628, 631 (2d Cir.1993) (government may properly employ joint trials "as a means of economizing judicial and other resources", and comply with its due process obligations).

Notwithstanding proper joinder, counts charged in the same indictment may be severed, under Fed.R.Crim.P. 14, if joinder presents a risk of prejudice. Given the balance struck by Rule 8, which "authorizes some prejudice" against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in "substantial prejudice." *Turoff,* 853 F.2d at 1043; *see United States v. Cervone,* 907 F.2d 332, 341 (2d Cir.1990) (defendant must show he was so severely prejudiced by spillover evidence that joint trial constituted a miscarriage of justice), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 680, 112 L.Ed.2d 672 (1991). "A motion for severance under Rule 14 is addressed to the discretion of the trial court, ... and the sound exercise of that discretion is virtually unreviewable." *United States v. Arocena,* 778 F.2d 943, 949 (2d Cir.1985), *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986).

Amato complains that the evidence of internecine warfare prejudiced him because it linked him to killings in which he did not participate, thus making it more likely that the jury would believe he participated in the Ocera murder. However, the evidence of how and why Amato came to possess a gun—namely his desire to defend himself in a gang war—was relevant to establish his membership in the Colombo family, and was indepen-

dently admissible as to the RICO counts. Given this overlap in evidence and the court's repeated cautionary instructions to the jury limiting the use that the jury could make of the war evidence, we find no merit in the claim of prejudicial spillover. *See United States v. Villegas,* 899 F.2d 1324, 1347 (2d Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990). Moreover, the most lurid evidence of a gang war was elicited as a result of the defense strategy to impeach Ambrosino, a cooperating coconspirator, with evidence that he was one of the most ferocious participants in the war, and attempted to kill about 17 members of the Orena faction.

### D. Sentencing Issues

█ Amato claims that his statutory right to "individualized sentencing," *see* 18 U.S.C. § 3553(a), was violated by the trial court's preparation of a joint Sentencing Memorandum and Order to explain the terms of life imprisonment imposed on Amato and two of his codefendants. This claim is completely without merit. The Sentencing Memorandum and Order separately addresses Amato and each of his codefendants and identifies specific reasons for Amato's sentence. In accordance with U.S.S.G. § 2A1.1, commentary n. 1, life imprisonment was an appropriate punishment for the premeditated murder of Ocera.

█ Amato also claims that the sentencing court failed to consider Amato's ability to pay the $1,750,000 fine. However, Amato had the burden of establishing his inability to pay. Given the ample trial record of Amato's participation in lucrative illegal businesses and the other evidence of Amato's considerable assets, it is unsurprising that he failed to convince the district court on this score.

### III. CONCLUSION

We have considered all of Amato's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.