**Rafael Hilario ARAUJO, Jacinto Alberto Vasquez and Manuel Rodriguez, Petitioners,**

**v.**

**UNITED STATES of America, Respondent.**

Nos. 96 Civ. 3441 (MBM), 96 Civ. 3655 (MBM) and 96 Civ. 6958 (MBM).

United States District Court, S.D. New York.

Oct. 25, 1996.

Rafael Hilario Araujo, Loretto, PA, pro se.

Jacinto Alberto Vasquez, Fort Dix, NJ, pro se.

Edward S. Zas, New York City, for Petitioner Rodriguez.

Mary Jo White, United States Attorney for the Southern District of New York, Mylan L. Denerstein, Assistant U.S. Attorney, New York City, for U.S.

OPINION AND ORDER

MUKASEY, District Judge.

Rafael Hilario Araujo, Jacinto Alberto Vasquez and Manuel Rodriguez were convicted under indictment 90 Cr. 60, following an eight-day jury trial in 1990, of conspiring to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, and using and carrying firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Araujo and Rodriguez were sentenced to 78 months each on the conspiracy count; Vasquez was sentenced to 66 months on the conspiracy count; all three were sentenced to a mandatory 60 months consecutive sentence on the firearms count, which was Count Two of the indictment. All three now petition pursuant to 28 U.S.C. § 2255 to vacate the judgments of conviction entered against them on Count Two, and the resulting 60-month sentences, on the ground that the court's instruction to the jury as to what constitutes "use" of a weapon was improper under *Bailey v. United States,* — U.S. —, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

As the government concedes, the instruction on "use," although proper under prevailing law in this Circuit at the time it was given, was improper under *Bailey.* However, as explained below, the error was harmless because the proof at trial was such that the jury necessarily found facts sufficient as to each of these petitioners to sustain a conviction for "carrying" a weapon during and in relation to a drug offense in violation of the same statute. Therefore, the requested relief must be denied and the petitions dismissed.

I.

The evidence at trial showed that the negotiations that led ultimately to the defendants' arrest began in November 1989 when Araujo expressed to Jose Navas Prieto ("Navas"), a Drug Enforcement Administration informant, his interest in obtaining kilogram quantities of cocaine. (Tr. 322–23) By January 24, 1990, their negotiations had progressed to an agreement that Araujo and his associates would buy three kilograms at $24,-

000 per kilogram, and that the transaction would be consummated at 66th Street and West End Avenue in Manhattan, a location selected by the DEA. (Tr. 327–29)

As Araujo and Navas drove to Manhattan from Queens, Navas stopped and, as instructed, contacted another DEA informant, Mario Perez, who would pose as the seller of the cocaine. (Tr. 328–29, 430) He also spoke with DEA agent James Clifford and told the agent that he and Araujo would be traveling in a blue Mazda. (Tr. 62–63)

Clifford testified that when he arrived at the scene he noticed a white car parked on West End Avenue. Although his car was moving and the passenger windows of the white car were tinted, he was able to see four occupants in the vehicle. (Tr. 57) Rodriguez has suggested that the white car may have had four doors, but the testimony at trial established unequivocally that it was a two-door vehicle. (Tr. 217–18, 225–26)

After Clifford and other DEA agents arrived on the scene, Clifford saw Navas and Araujo arrive in the blue Mazda. Some time thereafter, Araujo and Navas left their vehicle and waited on the corner. (Tr. 64–65, 329–30) Shortly after that, Inocencio Jimenez–Rodriguez, also a defendant in this case, got out on the passenger side of the white car, crossed West End Avenue, and met with Araujo and Navas. (Tr. 64–67, 103–04, 330–36) He said he had come to buy three kilograms of cocaine and was ready with cash that he and others had been collecting that day. (Tr. 335–36) He added that he had not yet counted the money because he and his colleagues had been robbed by a group of Dominicans who made off with more than $100,000 of their money. (Tr. 341)

When Perez arrived, posing as the seller, he parked his car behind the white car and crossed West End Avenue to meet with Navas, Araujo and Jimenez–Rodriguez. (Tr. 68–69, 343–44, 432–34, 489, 556) After introductions, Perez asked to see the money. (Tr. 343–44, 436–37) Jimenez–Rodriguez agreed (Tr. 441), and he, Araujo and Perez crossed the street toward the white car. (Tr. 69) As they did so, Jimenez–Rodriguez, in Araujo's presence, explained to Perez why he and his

cohorts in the white car were carrying weapons:

> We are all carrying weapons. I didn't want you to think that we are going to rob you. The only reason we are carrying weapons is because right now we are very distrusting and it is for our protection. And at any time when we see one of the Dominicans who had stole the money from us, at any moment we are going to kill them. That is why we are carrying weapons at all times.

(Tr. 442)

Perez had been instructed to signal the DEA agents with a beeping device when he saw the money. (Tr. 72) Perez leaned into the white car through the open door, saw the driver and two passengers in the rear seat, and saw a paper bag containing the money. (Tr. 345–46, 444–45) Perez then gave the signal and walked away; Jimenez–Rodriguez and Araujo followed him and were arrested. (Tr. 70–71, 345–46, 444–45)

Clifford testified that when he heard Perez's signal, he drove his car in front of the white car, ran to the front of that car, pointed his gun over the hood and shouted, "Police" and "Policia." (Tr. 74) The front window of the white car was not tinted and Clifford was able to see the driver, later identified as Modesto Rodriguez, and two other occupants in the back seat. (Tr. 74–76, 95) He saw Modesto Rogriguez's hand come up from his waist holding a semi-automatic pistol and pass it over his left shoulder to someone sitting behind him. (Tr. 77) The person sitting behind the driver was later identified as Manuel Rodriguez. (Tr. 79)

The driver, Modesto Rodriguez, was the first to be removed from the car, followed by Vasquez, who was sitting in the rear seat on the passenger side, and then Manuel Rodriguez from the rear seat on the driver side. (Tr. 79–80)

After the defendants had been secured, Clifford's partner, Jonathan Wilson, leaned into the white car to search for the weapon Clifford had seen, possibly others, and the money. (Tr. 82) Clifford testified that he stood behind Wilson as Wilson leaned into the car and passed back to Clifford the objects he retrieved. (Tr. 82–83) Clifford testified that Wilson first retrieved from the driver side of the rear seat—the seat where Manuel Rodriguez had been sitting—a .45 caliber semi-automatic pistol. (Tr. 83) Wilson then retrieved from the middle of the back seat, the area between where Vasquez and Manuel Rodriguez had been sitting, a Mack–10 machine pistol. (Tr. 85) The money was then retrieved from the floor on the passenger side of the back seat area, followed by a .9 millimeter pistol from under the driver's seat. (Tr. 86–87)

The charge to the jury, as noted above, was improper under *Bailey* in that it permitted the jury to find a defendant guilty of "using" a weapon in violation of 18 U.S.C. § 924(c) if the jury found that the defendant had possessed the weapon under circumstances suggesting that the defendant intended to have it available during an existing drug transaction, or kept the weapon strategically located so as to be available for use during a drug transaction. (Tr. 926–27) However, petitioners have not challenged the instruction as to what constituted "carrying" a weapon in violation of § 924(c). Nor have they challenged the instruction as to liability under *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), which permits a jury to convict a defendant of a substantive offense if the jury finds that that defendant was a member of a conspiracy, that another member of that conspiracy actually committed the substantive offense, that commission of the substantive offense was in furtherance of the conspiracy, and that the defendant in question reasonably could have foreseen that the substantive offense would be committed. (Tr. 930–31)

## II.

▮ Notwithstanding a jury instruction on "use" that is defective under *Bailey*, a conviction will be upheld and the error found harmless "where it could be said, based on consideration of the entire jury charge and the evidence, that the jury's finding of a section 924(c) violation was the 'functional equivalent,' *Sullivan v. Louisiana,* 508 U.S. 275, 279–81, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993), of a finding that the firearm had been

unlawfully carried." *United States v. Vasquez*, 85 F.3d 59, 60 (2d Cir.1996) (citing *United States v. Pimentel*, 83 F.3d 55 (2d Cir.1996)). Thus, the *Vasquez* Court continued, the conviction in *Pimentel* was upheld "because the firearm was only in one location, and that location was immediately accessible to a co-defendant for whose offense the appellant was liable under a *Pinkerton* charge." *Id.* However, the *Vasquez* court concluded,

> the evidence in the pending case, if accepted by the jury, reveals that the gun could have been found to have been located at either (or both) of two locations. One location was Vasquez's apartment. The other was on his person when he went to a meeting with his narcotics associates. Under the instructions, the jury could have improperly found the first circumstance to be 'use' and properly found the second circumstance to be 'carrying.' Since we are unable to determine whether the verdict rested on a legally sufficient theory and the verdict is not the functional equivalent of a necessary finding of 'carrying,' we agree ... that the firearm conviction must be reversed.

*Id.*

■ Moreover, "a gun can be 'carried' within the meaning of § 924(c) when it is concealed in a location that is immediately accessible to a perpetrator of a drug offense." *Pimentel*, 83 F.3d at 59. Thus, in *Pimentel*, a defendant's conviction was upheld despite a "use" instruction defective under *Bailey* because, on the facts present in that case, the jury necessarily found that a codefendant "carried" the weapon there at issue and the jury was properly charged on a *Pinkerton* theory of liability. *Id.* at 58–59.

From *Pimentel* and *Vasquez* it would appear that if, on the evidence presented here, the jury's verdict was the functional equivalent of a finding that petitioners "carried" any of the weapons at issue in violation of the statute, or any codefendants who may have been found to have been acting in concert with them did so under circumstances foreseeable to petitioners, their convictions must stand.

### A. *Araujo*

■ Araujo, appearing *pro se*, casts his argument in terms of sufficiency of the evidence (Araujo Mem. 9–10), although he inaccurately presents and then disputes that evidence. (*Id.* at 3–4) However, although Araujo was not shown at trial to have handled or been in close proximity to any weapon, the proof did show that he was present when Jimenez–Rodriguez told the informant Perez that he and the others in the white car were carrying guns in order to protect the money that was to be used to pay for the drugs, and that Araujo thereafter continued to act and function as a member of the conspiracy. (Tr. 442) Moreover, the jury necessarily based its verdict against Araujo on the testimony about Jimenez–Rodriguez's statement because there was no other evidence tending to connect Araujo with the weapons in the white car even pursuant to the concededly improper "use" charge.

Thus, if anyone in the white car was "carrying" a weapon in violation of § 924(c), Araujo may continue to be held responsible for that violation as well under a *Pinkerton* theory of liability, just as was petitioner in *Pimentel*. Proof of such a violation may be found in Clifford's testimony that he saw Modesto Rodriguez, who was also convicted on Count Two and is not a petitioner here, pass a gun from the driver's seat to someone in the rear seat. Modesto Rodriguez was necessarily found to have carried a gun in aid of the conspiracy of which Araujo was found to have been a member, and at a time when Araujo was aware that a gun was being so employed. Therefore, Araujo's conviction must stand.

### B. *Vasquez*

■ Vasquez, also appearing *pro se* and apparently appending Point III of his brief on appeal as his argument, seems to cast his argument in the same terms as Araujo. The proof against him of "carrying" was far more direct. As set forth above, Vasquez was removed from the rear passenger-side seat of the white car. (Tr. 79–80) The Mack–10 machine pistol was found on the middle of that seat and the .45 caliber semi-automatic on the opposite side—both locations within

reach of Vasquez. (Tr. 82–85) Which is to say, the proof at trial that necessarily underlay the guilty verdict on Count Two would convict Vasquez of "carrying" both weapons.

Independently, Vasquez would have been convicted on the same *Pinkerton* theory that resulted in the verdict against Araujo.

For the above reasons, Vasquez's conviction must stand.

## C. *Rodriguez*

Rodriguez, through counsel, makes a somewhat more meandering argument apparently intended to circumnavigate the long line of authority holding that after a conviction, evidence is evaluated for sufficiency in the light most favorable to the government, with all reasonable inferences drawn in the government's favor. *E.g., United States v. Amato,* 15 F.3d 230, 235 (2d Cir.1994); *Billy–Eko v. United States,* 968 F.2d 281, 282 (2d Cir.1992), vacated on other grounds, 509 U.S. 901, 113 S.Ct. 2989, 125 L.Ed.2d 685 (1993). Thus Rodriguez insists, without benefit of citation, that this is not a sufficiency-of-the-evidence case, and therefore that the court may not view the evidence through a government-oriented prism. (Rodriguez Reply Mem. 3–4) He then describes in his reply brief the notes of DEA Agent Charles Fredericks, who was not present at the scene, about a conversation with Clifford. Those notes were admitted into evidence at trial as a prior inconsistent statement by *Fredericks* during the testimony of Fredericks, not during the testimony of Clifford, who was not confronted with them, to suggest that the Mack–10 machine pistol was found in the front seat. (Rodriguez Reply Mem. 5; GX 3504 C) Counsel then combines that imagined contradiction in the testimony of *Clifford* with misconduct allegations in another case against the same DEA group that investigated this case (*Id.* at 5 fn. 1), and with summation attacks on Clifford's account of what he could or could not have seen that were made by counsel for Modesto Rodriguez (*Id.* at 6–10), and invites the conclusion that it is impossible to be certain where the jury determined that the .45 caliber pistol and the Mack–10 machine pistol were found, and that there is doubt his client could have

reached the .9 millimeter pistol under the front seat, even if the jury believed that it was found there. (*Id.* at 10–11)

There are numerous weaknesses in this hypothetical chain, starting with the stark fact that Rodriguez plainly could have reached the .9 mm pistol directly beneath the seat in front of him. Further, the note entry on which Rodriguez relies was itself contradicted by another entry in the same notes, which indicated that the Mack–10 machine pistol indeed was found in the back seat (Tr. 638–39) and, as noted, those notes were not received in evidence as a prior inconsistent statement by Clifford, who was never confronted with them, but only as a (perhaps) inconsistent statement by Fredericks, who in any event was not present when the weapons were retrieved.

Further still, it is difficult, if not entirely impossible, to understand how the jury returned a guilty verdict against Rodriguez even with an improper "use" instruction if it did not accept Clifford's testimony as to where the guns were found, inasmuch as Clifford testified that he saw only Modesto Rodriguez handle one of them and no weapon could have been within either Vasquez's or Manuel Rodriguez's "control" if neither could reach it.

But beyond all that, it is at least implicit in *Vasquez,* if not explicit, that a court presented with a motion like the one at issue here is to presume that the government's evidence at trial was believed by the jury: "[T]he evidence in the pending case, *if accepted by the jury,* reveals that the gun could have been located at either (or both) of two locations." *Vasquez,* 85 F.3d at 61 (emphasis added). The "evidence" under discussion there plainly is the evidence presented by the government, no doubt disputed on credibility and other grounds by that defendant as the evidence in this case was by these petitioners.

However, to say that the evidence must be viewed in the light most favorable to the government and that all reasonable inferences must be drawn in the government's favor, means only that factual conclusions, but not necessarily legal conclusions, must be

drawn in the government's favor. That distinction accounts for the result in *Vasquez,* where the government's evidence placed a weapon in one or both of two locations—defendant's apartment or on his person—and the Court assumed that the jury could have found that the weapon had been in either or both. If the jury found the weapon in his apartment, and on that basis convicted for "use," such a conviction was improper under *Bailey;* if the jury found the weapon on his person and convicted for carrying, such a conviction was proper. The Court assumed that the jury believed the weapon was in both places, but because there was no way to determine on which basis the jury had actually convicted, reversal was required. In this case, accepting the government's evidence, there was only one place where each weapon was said to have been found, and there is no basis for assuming that the jury concluded that any of the weapons had been found elsewhere or, as Rodriguez suggests at one point, not found at all. (Rodriguez Reply Mem. 7) That location—the back seat where both Jacinto Alberto Vasquez and Manuel Rodriguez were seated—would compel a conviction for "carrying" under the standards of *Pimentel* even though it would not permit a conviction for "use" under the standards of *Bailey.*

Independently, Manuel Rodriguez too would be convicted on the same *Pinkerton* theory that upholds Araujo's conviction.

Because the jury verdict necessarily was based on facts that would convict Rodriguez of "carrying" a weapon, his conviction as well must stand.

\* \* \*

For the above reasons, the writs are denied and the petitions dismissed.

SO ORDERED.