**UNITED STATES of America, Appellee,**

v.

**Milagros COTA, Leoncio Hernandez, Altagracia Hernandez, Defendants,**

**Milagros Cota, Defendant–Appellant.**

**No. 480, Docket 91–1364.**

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1991.

Decided Jan. 6, 1992.

Jack Wenik, Asst. U.S. Atty., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Jerome C. Roth, Asst. U.S. Atty. E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Michael Kennedy, New York City (Gregory Lenihan, of counsel), for defendant-appellant.

Before KAUFMAN, MINER and ALTIMARI, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Guilt by association has never been enough to sustain a criminal conviction in our system of justice. In both conspiracy and money laundering cases, an independent showing of knowledge, participation, and intent must be proven to establish each party's alleged involvement in a scheme. The matter at issue in this case is whether criminal intent could be imputed to the seemingly innocent sale of two family-owned properties where there was no evidence that the appellant, Milagros Cota, was connected to the drug trafficking scheme that occasioned the original purchase of the homes, but there was sufficient circumstantial evidence for the jury to infer her knowledge of the illicit source of the properties and participation in the family-run conspiracy to conceal proceeds of the sale. Based on a number of incriminating statements, the tape-recorded testimony of two relatives conspiring to sell the homes, and other evidence, all of which we find to have been properly admitted, we hold the circumstances warranted a finding of appellant's guilt. The jury instructions and sentencing were also proper.

For the reasons stated below, we affirm Judge Sifton's denial of Cota's motion to set aside the jury's verdict. We also affirm his decision to uphold her convictions of one conspiracy charge and two substantive counts of money laundering, in violation of 18 U.S.C. § 371 and § 1956(a)(1)(B)(i).

## BACKGROUND

During the years that Milagros Cota was serving abroad in the United States Army, members of her extended family formed a multi-million dollar heroin trafficking ring known as the "Hernandez Organization," named for its prime founder, appellant's brother Leoncio Hernandez. In furtherance of their extensive trade, members of the family purchased four private residences in Queens, New York with proceeds from their illegal narcotics activities. At various times, the houses were used for distributing and packaging heroin, counting money, and making deliveries.

Tipped off to the ring, agents from the Drug Enforcement Administration ("DEA") and U.S. Customs Service arranged for a wiretap to be installed at one of the houses. In a recorded conversation on March 30, 1989, the owner of the house, Leoncio Hernandez, and his common law wife Altagracia, discussed a conspiracy to dispose of the properties which had been utilized in the course of their drug trafficking. Leoncio instructed his wife to "give him the three thousand and put the 'for sale' on the house ..." He then proceeded to assign a specific value to each house intended for sale, indicating that whether he gained or lost from the sales, he "just want[ed] to get out of it."

At no point during the conversation was appellant's name mentioned, or her knowledge or intended participation in the conspiracy to sell, alluded to. Indeed, in the wake of an extensive investigation launched by the DEA following the conversation, whereby various members of the Hernandez ring were arrested and currency and drugs were seized from the homes, Cota was never implicated in the actual drug trafficking activities. An arrest warrant was issued for Leoncio and Altagracia, but they escaped and assumed fugitive status. Cota's sister, Jacqueline Chavez, was also arrested, and Cota posted the bond for her release.

Some time following these arrests, Cota got in touch with the employer of her convicted sister—a self-employed real estate broker by the name of Jose DeLaCruz—to arrange for the planned sale of the family's properties in Queens. Although she was not named as an owner of any of the homes, Cota took it upon herself to sign

the contracts of sale with the inscription "Milagros Cota, Attorney in Fact." The negotiated prices for the homes were considerably less than those originally suggested by Leoncio in the tape recorded conversation, ostensibly because the mortgages were in arrears and foreclosure was imminent.

Approximately one week after the contracts of sale were executed, but before the formal closings were held, the DEA had its first contact with Cota, when Deputy Sheriff Hudson of the Oneida County Sheriff's Department spotted her driving a maroon Cadillac on June 13, 1989. DEA agents had advised upstate New York law enforcement officials to be on the look-out for the car, which was thought to be in the possession of another fugitive, Cota's brother David Hernandez, who often visited the vicinity of her upstate home. On the suspicion that she was harboring the fugitive, officers stopped Cota, had her exit the car at gunpoint, and handcuffed her. They also stopped the driver of the jeep riding behind her, which contained Cota's husband and her niece. After it was determined that the suspected fugitive was not in the car, Cota was unhandcuffed. Hudson then advised the Cotas that the Cadillac was being seized, and asked them to accompany him to the Sheriff's station to answer questions about how and why they came to be in possession of the car, and whether they had any information about the fugitive, David Hernandez. The Cotas both agreed to come, ostensibly out of concern for the return of the Cadillac. Cota and the niece rode in the Sheriff's unmarked car, with her husband following in the Jeep behind.

Once at the station, Cota was assured she was not under arrest. Accordingly, she was not read her *Miranda* rights. She was guided to the squad room, a secured area of the office behind the public waiting room, where she was allowed to move about freely. In response to Cota's inquiries about the whereabouts of her Cadillac, she was told that DEA agents from New York City were on their way to the station to ask her more substantive questions, and would take a few more hours to arrive. With her husband in an adjoining

room, Cota continued to wait "at her own will," as Sheriff Hudson testified, for the duration of the six hours until DEA agents Whipple and McAleer finally appeared. During the interview, Cota made a number of incriminating statements that were later used as evidence of her knowledge of her family's participation in the drug trafficking schemes. Agent McAleer also testified that Cota stated that she knew her brother Leoncio was hiding as a fugitive in the Dominican Republic. At no point during the interview did Cota or her husband ask to leave, demand a lawyer, or refuse to answer questions.

Approximately one month after this incident, Cota flew to the Dominican Republic to obtain powers of attorney from the family members listed as the official owners of the properties she was engaged in selling—including the fugitive, Leoncio. Upon her return, formal closings were held for three of the four properties. Cota attended the closing for the sale of 102–21 LaRue Avenue, even though she had not acted as the seller for the nominee owner. She also later received an assignment of a $50,000.00 mortgage note from the named owner of the property, Jose Nunez, for no consideration.

For the house at 37–34 102nd Street, DeLaCruz wrote Cota a promissory note in the amount of $140,547.00. Eventually, he paid off $85,000 of this sum in the form of a certified check issued to Cota. Cota deposited $5,000.00 for herself, and had her bank issue a new check for the balance, which was made payable to another of her relatives, Carlos Cota, who was then living in Mexico. It was subsequently discovered that appellant had rented a safe deposit box in another bank, where she kept the documents of the sale and a copy of the check she received from DeLaCruz. Before Carlos Cota's check was cashed, the DEA got wind of the scheme and ordered a stop payment.

On November 3rd, 1989, DEA Agent Whipple filed a complaint against appellant alleging participation in a money laundering scheme. Following a four day surveillance, a warrant was obtained for her ar-

rest. Consequently, on November 8th, in the parking lot of the military base where Cota's husband was employed, Cota was approached by the agents, who testified that they identified themselves, told her the cause of the arrest, handcuffed her, and read her her *Miranda* rights. Rather than take her directly to the magistrate for arraignment, Agent Whipple decided to first return to Cota's home to supervise the search that was underway there. On the way, Whipple again informed Cota of the cause of the arrest. The appellant then stated that she did not know that the properties were purchased with drug money, and that she herself had not received any money in consideration for her efforts. She also later asserted that she did not have any of the documents of the sale in her possession.

Once back at the house, Cota was handcuffed to the kitchen table. Sometime thereafter, she requested to speak to her attorney. Agent Whipple immediately ceased his questioning, and put the call through for her.

Following that, and before departing for the hour-long car ride to the nearest arraigning magistrate, Cota was frisked by Agent McAleer. The other officers present testified that the search was conducted with full propriety, despite Cota's claim of being harassed.

Once in the car, Cota again began volunteering information. After Agent Whipple advised her that he had been to her bank, Cota admitted to receiving the $85,-000.00 check from DeLaCruz, depositing $5,000 for herself, and having the balance sent to her relative in Mexico. She also revealed that Carlos was supposed to have mailed the check to another relative, Lucia Infante, who was the nominee owner of the property then living in the Dominican Republic.

Following indictment, Cota moved to suppress these statements, contending that she was constructively in custody or deprived of her freedom of action in a significant way during the time she made them. At a pretrial hearing held on May 18, 1990, Judge Sifton denied her motions and admitted the evidence. At trial, he also admitted the tape recorded conversation between Leoncio and Altagracia Hernandez on the condition that independent evidence would be presented to establish the existence of the conspiracy and Cota's involvement. Finally, he allowed a witness, Alipio Diaz, to testify about the drug ring and the properties' nominal owners. Cota was convicted by a jury of all four counts of money laundering on June 7, 1991. After dismissing two of these counts convicting Cota of the illicit sales of the houses at 37–30 100th Street and 37–48 102nd Street for lack of evidence, and upholding the two other substantive counts, of laundering proceeds from the sales at 37–34 102nd Street and LaRue Avenue, Judge Sifton denied Cota's motion to set aside the jury's verdict on May 30, 1990, and sentenced her to two concurrent 51 month terms of imprisonment. She was ordered on continued release on bail pending resolution of this appeal.

## DISCUSSION

The question governing this appeal is not whether Cota sold the homes in question—she admits that—but whether she engaged in the transactions with knowledge of the properties' illicit source, and with the intent to conceal or disguise the location or control of the sales' proceeds. In relation to her defense, Cota raises a number of other, largely evidentiary issues.

### I. Admissions of Evidence

#### A. *The Tape–Recorded Conversation*

■ Cota appeals Judge Sifton's decision not to suppress a number of her own statements, evidence, and testimony, which she claims unfairly prejudiced her case at trial. She first contends that the tape recorded conversation between her brother and sister-in-law (alleged co-conspirators), which revealed their plan to sell houses purchased with drug proceeds, should not have been admitted into evidence because no outside proof was first introduced to independently establish that there was indeed a conspiracy going on, or that Cota had any connec-

tion to it. *See United States v. Lyles*, 593 F.2d 182, 194 (2d Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979).

■ As Cota maintains, the tape was an out of court statement offered to prove the truth of the matter asserted. But Federal Rule of Evidence 801(d)(2)(E) permits admission of such hearsay if offered against the accused by a co-conspirator during the course of and in furtherance of the conspiracy alleged. While *United States v. Bentvena*, 319 F.2d 916, 949 (2d Cir.), *cert. denied*, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963), determined that this type of evidence cannot be admitted absent an *independent* showing of appellant's participation in the conspiracy, the Supreme Court in *Bourjaily v. United States*, 483 U.S. 171, 180–81, 107 S.Ct. 2775, 2781–82, 97 L.Ed.2d 144 (1987) found that under Fed.R.Evid. 104 the hearsay statement itself may be considered along with independent evidence in deciding the question of appellant's membership. Moreover, it is accepted practice for a trial judge to admit one disputed piece of evidence *subject* to receipt of other evidence that, by the end of the government's case, will establish the alleged co-conspirator's involvement. *See, e.g., United States v. Ziegler*, 583 F.2d 77, 80 (2d Cir.1978). This involvement, and the fact that a conspiracy existed at all, need only be established by a preponderance of the evidence for purposes of admission. *See Bourjaily*, 483 U.S. at 175–76, 107 S.Ct. at 2778–79.

■ At trial, evidence of the strange nature of the deposits of the proceeds of the sale, Cota's use of a different bank to store the documents from the sale, her initial denial of having participated in the sale, and her attempts to contact the fugitive brother who had originally orchestrated the conspiracy for power of attorney *after* she had already signed the contracts of sale, all provided Judge Sifton with ample reason to rule to admit the tape. As this court has repeatedly held, once a conspiracy is established, only slight, even circumstantial evidence is needed to link another defendant with it. *United States v. Ciambrone*, 787

F.2d 799, 806 (2d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

### B. *The Self–Incriminating Statements*

Cota also contends the district court erred in not suppressing the statements she made when stopped, and later when arrested, arguing that they were made under duress and admitted into evidence in violation of her constitutional right against self-incrimination.

■ Cota first maintains that on June 13, 1989, she was effectively taken into custody by the officers who stopped her and took her to the Oneida Sheriff's office, and that their failure to read her her *Miranda* rights rendered her statements unusable at trial. The question of the voluntariness of Cota's statements is subject to *de novo* review by this court. We note from the outset that "[o]nly questioning that reflects a measure of compulsion above and beyond that inherent in custody itself constitutes interrogation the fruits of which may be received only after *Miranda* warnings have been given." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987). In making this assessment, we consider the totality of the circumstances of the agents' conduct. *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990).

■ Far from disagreeing with Judge Sifton's finding that Cota freely volunteered information and was not in custody during her six hour stay at the sheriff's station, we find the testimony of the DEA agents and Deputy Sheriff Hudson to have adequately established the consensual nature of Cota's visit. We also find it to have been reasonable for the district judge to believe that Cota's willingness to accompany the officers to the station in the first place was spurred by her own concern for the return of her seized car, rather than by the allegedly coercive environment of the

stop. Not only was the initial use of guns and handcuffs necessitated by the officers' safety concerns, but the handcuffs were removed as soon as the car was examined and the perceived security threat abated.

Just as it was clearly Cota's choice to go to the station and wait for the agents, so was it her choice not to leave while they were asking her questions. At no time during the interview did Cota or her husband appear intimidated, or request that the questioning cease. Nor did they have their movement impaired. In fact, they were explicitly told by Agent McAleer that they were free to leave at any time. The statements made under these conditions were thus properly admitted.

■ Cota also claims that the circumstances of her arrest on November 8, 1991, were so coercive and intimidating as to render her volunteered statements inadmissible. While the factual question of whether *Miranda* rights were read to an apprehended suspect is the key determination to be made here, it also must be decided whether Cota's waiver of her right against self-incrimination was made knowingly and voluntarily, or if the behavior of arresting officers overbore her "free, independent will." *United States v. Fritz*, 580 F.2d 370, 377 (10th Cir.) (*en banc*), *cert. denied*, 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978) (citations omitted).

At the Pre–Trial Suppression Hearing, Agent Whipple testified that Cota was read the DEA's standard " 'Advice of Rights 13–A' in English," immediately upon her arrest (Transcript, p. 68). Judge Sifton found this testimony, as later corroborated by Agent McAleer, to be persuasive. We defer to his findings, as "[a]ssessments of the credibility of witnesses are the province of the district court and we are not entitled to overturn those assessments." *United States v. Maldonado–Rivera*, 922 F.2d 934, 972 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1025, 1026 (1991).

■ There was no evidence that the manner of the arrest was made deliberately public or coercive. Nor is there any evidence to support Cota's claim that the de- ·

lay occasioned by driving her back home, rather than directly to the arraigning magistrate, was excessive or intended to elicit incriminating statements. Cota volunteered the statements at her home in a manner that reflected her knowing and voluntary intent to waive her rights. As the court held in *United States v. Rubio*, 709 F.2d 146, 152 (2d Cir.1983), an express statement is not required to establish such a waiver. Moreover, Cota's request to call her lawyer midway through questioning indicated her awareness of her right not to respond in his absence.

■ Cota's subsequent statements in the car on the way to arraignment were also not the product of custodial interrogation. Nor were they solicited in any way. As Agent Whipple testified at trial, Cota was the one to initiate the discussion, inquiring of *him* why she was being arrested. In responding (and telling her of his awareness of the bank deposits she had made), Whipple did not engage in express questioning or its "functional equivalent." Neither did he create an atmosphere whereby his words or actions were "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). Under these circumstances, where an agent "supplied [the defendant] with general information regarding the crime [s]he was suspected of committing, in response to [her] own questions," voluntary statements made by a suspect who understands her rights are not prohibited. *United States v. Guido*, 704 F.2d 675, 677 (2d Cir.1983). Neither was a renewed reading of the *Miranda* warning necessary in order to render Cota's statements admissible.

### C. Testimony of Alipio Diaz

■ Cota contends that the testimony of this witness, who did not even know her, should have been suppressed on grounds that its prejudicial effect "monumentally" outweighed its minimally probative value. Alipio Diaz was a confessed participant in the Hernandez' drug trafficking organiza-

tion—an aspect of the scheme in which Cota was never involved. He was also arrested months before Cota got involved in the money laundering side of the conspiracy. But Diaz was in a position to know first-hand that the properties Cota sold were obtained with illegal drug money. Contrary to appellant's assertion, this aspect of the family's drug connections *was* an issue at her trial. Diaz also knew Leoncio Hernandez, and was able to testify about which members of the Hernandez family owned what properties. As the court held in *United States v. Diaz,* 878 F.2d 608, 614 n. 2 (2d Cir.), *cert. denied,* 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989), testimony about such peripheral matters is admissible, even if it falls outside the time frame alleged in an indictment, so long as it is relevant to an issue at trial. The court therefore neither acted arbitrarily nor irrationally when it admitted the testimony of Diaz, particularly since Judge Sifton gave the jury limiting instructions as to what inferences they could derive from hearing the witness.

## II. Sufficiency of Evidence

The crux of Cota's appeal stems from her claim that the government presented insufficient evidence to prove that she attempted to conceal or disguise proceeds from the property sales she brokered. The very nature of real estate transactions necessitates a degree of public openness from which an inference of wrongdoing is not readily drawn. At one point prior to trial, Judge Sifton even warned the prosecution:

"The real problem is you've got a set of transactions which are so open and above board that I'm having great difficulty seeing how it is that you conceive the idea of indicting this defendant."

Cota faces a very heavy burden in challenging the jury's findings on these grounds, however. All testimony presented at trial and all inferences on appeal are to be taken in favor of the government. *United States v. Torres,* 901 F.2d 205, 216 (2d Cir.), *cert. denied, Cruz v. United States,* —— U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Furthermore, convic-

tion must be upheld if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Although the fact that the houses were sold at a "bargain" price to one buyer, rather than placed on the open market at their fair value, does not in itself raise the specter of a drug sale (since there was evidence that the deals Cota helped broker were distress sales, occasioned by mortgages being held in arrears), other circumstantial evidence clearly implicates Cota of a conspiratorial role in laundering the house proceeds. First, there was the fact of her intimate association with the ringleader of the conspiracy—Leoncio Hernandez. The closeness of their business relations in particular implied that Cota knew Leoncio was the owner of the house she was selling. Since Cota also admitted to DEA agents that she knew her brother was hiding out as a fugitive, it was reasonable for a trier of fact to infer that she had deduced (or been told) that the properties had been purchased with the only source of income Leoncio had available to him—drug trafficking money.

As for the allegations that Cota attempted to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" in violation of 18 U.S.C. § 1956(a)(1)(B)(i), most telling of her intent was the strange manner in which she received and deposited proceeds from the sales at 37–34 102nd Street and LaRue Avenue. Although there was nothing unusual about her keeping a percentage of the sales income as gratuity for her services, a ready inference of suspicion arises from Cota's acceptance of $50,000.00 from the nominal owner of a property she only peripherally aided in closing. A further inference of guilt was created when Cota lied to the DEA agents about not receiving reimbursement for the deal, and about not having any documents relating to the sale in her possession. A reasonable jury might

well have concluded that a sale so above-board and innocent as Cota contends would not occasion this degree of secrecy. Moreover, there was the fact that Cota rented a safe deposit box at a different bank from the one she did her regular business at, solely to store the papers which documented these sales. Finally, there was Cota's suspicious attempt to disguise the eventual destination of the bulk of the proceeds, by first having her bank issue a check to Mr. Carlos Cota, and then having him re-issue or forward the check to another family member. All of these facts revealed Cota's intent to conceal, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

### III. Jury Instructions and Sentencing

Appellant contends that the court erred in not giving a specific intent instruction which distinguished the elements of the money laundering crimes she was charged with from the drug trafficking charges her family was convicted of. But the instructions Judge Sifton gave perfectly clarified the scope of illegality this jury was directed to concern itself with. He instructed that conviction must be predicated both on a finding that appellant knew that the properties involved in her real estate transactions constituted the proceeds of narcotics distribution, and that she acted with the intent to conceal the ownership or control of these narcotics proceeds.

Cota also maintains that Judge Sifton was unduly harsh in refusing to acknowledge either her acceptance of criminal responsibility, or the mitigating circumstances that occasioned her participation in the conspiracy. But Judge Sifton's refusal to afford Cota a reduction in her base offense level was fully justified. After protesting her innocence unremittingly throughout the course of trial, and swearing that the incriminating statements she made were the product of coercive intimidation on the part of arresting officers, Cota has no standing to now paint these statements as voluntary, exculpatory admissions.

As for challenging Judge Sifton's discretion in finding that no mitigat-ing circumstances warranted a downward departure in sentencing, Cota offers no proof that her case merited such consideration. The fact that she did not receive "substantial financial rewards" for her laundering efforts is hardly surprising, given that her business associates were close family members. The fact that the homes were sold openly and *otherwise* "legally" also does not argue for mitigation. Finally, it was clearly not the government's responsibility to seize the homes—the fruits of Cota's temptation—before Cota involved herself in their sales, simply to prevent her from engaging in an illicit venture.

### CONCLUSION

Milagros Cota's convictions for conspiring to engage and engaging in her family's money laundering scheme were sufficiently supported by evidence of her criminal knowledge, concealment, participation and intent. The jury instructions and sentencing were also proper. Judgment denying appellant's motions to suppress evidence and set aside the jury's verdict is therefore affirmed.