UNITED STATES of America, Appellee,

v.

Victor J. ORENA, also known as Little Vic, Defendant–Appellant.

Nos. 702, 1182, Dockets 93–1397, 93–1697.

United States Court of Appeals, Second Circuit.

Argued May 20, 1994.

Decided Aug. 15, 1994.

Michael E. Tigar, Austin, TX (Gustave H. Newman, Andrew J. Frisch, Newman & Schwartz, New York City, of counsel), for defendant-appellant.

John Gleeson, Asst. U.S. Atty. E.D.N.Y. (Zachary W. Carter, U.S. Atty. E.D.N.Y., David C. James, Asst. U.S. Atty. E.D.N.Y., Brooklyn, NY, of counsel), for appellee.

Before: MESKILL, MINER, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Defendant-appellant Victor J. Orena appeals from a judgment of conviction entered May 26, 1993 in the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge*, after a jury found Orena guilty of: racketeering in violation of 18 U.S.C. § 1962(c);[1] racketeering conspiracy in violation of 18 U.S.C. § 1962(d); conspiracy to murder Thomas Ocera in violation of 18 U.S.C. § 1959(a)(5) and New York Penal Law §§ 125.25 and 105.15; the murder of Thomas Ocera in violation of 18 U.S.C. §§ 1959(a)(1) and 2 and New York Penal Law §§ 125.25 and 20.00; conspiracy to murder members of the Persico faction of the Colombo family in violation of 18 U.S.C. § 1959(a)(5) and N.Y.Penal Law §§ 125.25 and 105.15; conspiracy to make extortionate extensions of credit in violation of 18 U.S.C. § 892; conspiracy to make extortionate collections of credit in violation of 18 U.S.C. § 894; use and carrying of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1); and unlawful possession of firearms by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). 821 F.Supp. 870. On this appeal, Orena raises a multitude of challenges to his conviction and sentence. For the reasons that follow, we reject Orena's arguments for reversal and affirm the conviction. We also affirm the

---

1. The predicate acts alleged for the racketeering charge were: conspiracy to murder Thomas Ocera; murder of Thomas Ocera; conspiracy to murder Persico faction members; and loansharking conspiracy.

district court's denial of Orena's motion for a new trial pursuant to Fed.R.Crim.P. 33.

## Background

The charges in this case arise primarily from an internal war between opposing factions of the Colombo Family of the Cosa Nostra (the "Colombo Family") which has resulted in a number of criminal prosecutions in the Eastern District of New York. *See, e.g., United States v. Brady,* 26 F.3d 282 (2d Cir.1994); *United States v. Amato,* 15 F.3d 230 (2d Cir.1994) (affirming conviction of defendant initially charged in same indictment as Orena but separately tried).

The Cosa Nostra, also known as the Mafia, includes five New York families, the Bonnano, Colombo, Gambino, Genovese, and Lucchese families, each headed by a boss. The ultimate governing body of La Cosa Nostra is a Commission that superintends the activities of the five New York families and affiliated families in other cities. *See United States v. Salerno,* 868 F.2d 524, 528 (2d Cir.), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

Substantial evidence at trial established that after Colombo family boss Carmine Persico was incarcerated for a lengthy term in 1986 and a committee that was appointed to govern the Colombo Family proved unworkable, the Commission appointed Orena as the acting boss of the Colombo Family on Persico's recommendation. There was testimony that this occurred in approximately December 1988, and alternatively, that it occurred in late 1989 or early 1990.

In any event, there was considerable evidence that Orena thereafter aspired to become the official, rather than the acting, boss of the Colombo family, displacing Persico. Persico, in turn, indicated his intention to replace Orena with Persico's son, Alphonse Persico, who was scheduled for release from imprisonment in June 1993. This resulted in conflict between Orena and Persico factions of the Colombo Family in 1991 and 1992, including a number of assassinations and attempted assassinations.

Evidence was also presented concerning Orena's role in the murder of Colombo Family captain Thomas Ocera, which occurred on or about November 13, 1989. In October 1991, Michael Maffatore, a Colombo Family associate who had helped to bury Ocera's body, offered to cooperate with the F.B.I. He led F.B.I. agents to Ocera's grave site, where Ocera's body was unearthed with a metal wire still wrapped around his neck. After several months of investigation, Orena was arrested on April 1, 1992.

At trial, the government offered the testimony of Maffatore and Harry Bonfiglio, who also assisted in Ocera's burial, regarding Ocera's murder. Several other members of the Cosa Nostra testified about the racketeering and loansharking activities of Orena and the Colombo Family, and about Orena's various murder conspiracies. Of particular relevance on this appeal is the testimony of: (1) Joseph Ambrosino, a Colombo Family associate; (2) Alfonso D'Arco, a former acting boss of the Lucchese Family; (3) Salvatore Gravano, former under-boss of the Gambino Family and a government witness in several organized crime cases; and (4) Diane Montesano, Ocera's girlfriend at the time of his murder. The prosecution also introduced into evidence wiretap recordings relating principally to the racketeering and murder charges, as well as loansharking records seized from Ocera's restaurant and from an apartment used by two Orena faction associates. In addition, the district court admitted into evidence numerous firearms seized at the home of Orena's girlfriend, at which he was residing at the time of his arrest, including guns and ammunition hidden under a wooden deck in the back yard of the residence, as well as, *inter alia,* approximately $60,000 in cash, a bulletproof vest, three beepers, and three mobile telephones. Firearms and related apparatus seized from other Colombo Family members and associates were also presented in evidence.

The jury convicted Orena on all counts. The district court sentenced Orena concurrently to life imprisonment for racketeering, life imprisonment for racketeering conspiracy, life imprisonment for Ocera's murder, ten years on each murder conspiracy count,

twenty years on each loansharking count, and ten years for unlawful possession of a firearm by a convicted felon; and to a consecutive five-year sentence for the use and carrying of a firearm in relation to a crime of violence. Finally, the court fined Orena $2.25 million ($250,000 for each count), ordered Orena to pay the costs of his own imprisonment at a rate of $1,492 per month, and imposed special assessments in the amount of $450.

Orena appealed his conviction, and subsequently moved in the district court for a new trial under Fed.R.Crim.P. 33. The motion was based upon Gravano's alleged perjury and alleged prosecutorial misconduct in connection with Gravano's and Montesano's testimony. The district court denied the motion. Orena appealed that denial, and the appeal was consolidated with the prior appeal of his conviction. We address both appeals in this opinion.

### Discussion

On appeal, Orena presents the following arguments for reversal: (1) those counts of the indictment that depend upon the existence of a RICO "enterprise" fail to state a claim because the schism in the Colombo Family (the charged enterprise) that was alleged in the indictment and proved at trial precludes satisfaction of this statutory requirement; (2) the evidence was insufficient to sustain the substantive and conspiracy RICO convictions; (3) because there was no continuing RICO enterprise, the testimony of Persico loyalists regarding Orena's racketeering activity was improperly admitted as coconspirator testimony; (4) the indictment failed to allege an overt act as part of the murder conspiracy charges, as required by New York law, and therefore is fatally defective; (5) the count that charged a conspiracy to murder members of the Persico faction is also invalid because it failed to name all of the intended victims of that conspiracy; (6) the murder conspiracy and murder charges

must be dismissed because they failed to specify the types of homicide that Orena committed or conspired to commit; (7) the district court improperly admitted into evidence certain of the firearms seized from the house in which Orena was arrested, as well as firearms and related apparatus seized from other Colombo Family members and associates, without adequate authentication; (8) the district court improperly admitted the records retrieved from Ocera's restaurant and from an apartment used by Orena faction associates as loansharking records without adequate authentication; (9) the district court improperly excluded evidence that the government presented a conflicting theory of Ocera's death at another trial; (10) Judge Weinstein improperly fined Orena and required him to pay the costs of his incarceration; and (11) the government condoned perjury by Gravano, and improperly failed to disclose relevant evidence regarding the testimony of Gravano and Montesano, as a result of which Orena's motion for a new trial should have been granted. We address each issue below.

### A. The RICO Enterprise.

1. *The Sufficiency of the Enterprise Charge in the Indictment.*

The indictment in this case alleged at the outset that: "The members and associates of the Colombo Organized Crime Family of La Cosa Nostra ('the Colombo family') constituted an 'enterprise,' as that term is described in Title 18, United States Code, Sections 1961(4) and 1959(b)(2), that is, a group of individuals associated in fact." The indictment goes on, however, to detail the internecine warfare in which factions of the Colombo family engaged during 1991 and 1992. Orena contends, in effect, that the indictment was thereby rendered schizophrenic, with the result that all the counts of the indictment that depend upon the existence of a RICO enterprise[2] failed to state an offense.

---

**2.** The substantive RICO count alleges participation by Orena in the conduct of the Colombo Family's affairs, *see* 18 U.S.C. § 1962(c), and the RICO conspiracy count charges a conspiracy to do so. *See* 18 U.S.C. § 1962(d). The murder

count alleges a murder for the purpose of maintaining and increasing Orena's position in the Colombo Family, *see* 18 U.S.C. § 1959(a)(1), and the two murder conspiracy counts allege that he

Ordinarily, "[d]efenses and objections based on defects in the indictment" must be raised prior to trial, Fed.R.Crim.P. 12(b)(2), and it is conceded that this claim was not presented at any point in the proceedings in the district court. An exception is made, however, for claims that an indictment "fails to show jurisdiction in the court or to charge an offense," *id.*, and Orena contends that the alleged maldefinition of the "enterprise" element establishes that the affected counts of the indictment failed to charge an offense.

We are unpersuaded. The indictment clearly charged the Colombo Family as the RICO enterprise. Both the subsequent allegation and proof at trial of internecine warfare within that enterprise present, in our view, a question whether the existence of the enterprise was sufficiently proved, rather than adequately charged. Orena alternatively contends that the proof on this issue was insufficient, and we proceed to consider that question.

### 2. The Sufficiency of the Evidence of a RICO Enterprise.

■ "In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.'" *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). Orena contends that the evidence was legally insufficient to support the RICO verdicts because no rational juror could have concluded that the Colombo Family enterprise continued to exist after July 1991, when the Orena and Persico factions commenced their conflict. We disagree.

■ The RICO statute defines the term "enterprise" to include: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The existence of an internal dispute does not signal the end of an enterprise, particularly if the objective of, and reason for, the dispute is control of the enterprise. *See United States v. Coonan*, 938 F.2d 1553, 1560–61 (2d Cir.

engaged in those conspiracies for the same pur-

1991) (violent infighting, internal disputes, and membership changes did not negate ongoing existence of RICO enterprise), *cert. denied*, —— U.S. ——, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992); *cf. United States v. Locascio*, 6 F.3d 924, 929–30 (2d Cir.1993) (boss of Gambino family found guilty of achieving position by murdering his predecessor), *cert. denied*, —— U.S. ——, ——, 114 S.Ct. 1645, 1646, 128 L.Ed.2d 365 (1994). Further, as we recently observed in *Amato*, considering the related question of the continuation of a conspiracy: "Rivalry and dissension, however violent, do not necessarily signify dissolution of a conspiracy. An internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it." *Amato*, 15 F.3d at 234; *see also United States v. Aracri*, 968 F.2d 1512, 1522 (2d Cir.1992) (collecting cases). Thus, as a legal matter, the eruption of Orena–Persico conflict is not dispositive of the issue whether a single enterprise existed.

Moreover, the evidence in this case supported the verdict. For example, Ambrosino testified that Teddy Persico (a member of the Persico faction) expected Orena to continue to share loansharking proceeds with him. A surveillance recording indicated that Colombo Family members expected relationships to return to normal after the war was over. Gravano and D'Arco both testified that the other Cosa Nostra families assembled committees to resolve the dispute between the Orena and Persico factions in order to preserve the Colombo Family. D'Arco testified that Cosa Nostra leaders admonished Orena and Carmine Sessa, a leader of the Persico faction, to refrain from violence. D'Arco also testified that Sessa conceded that he was willing to accept Orena as the Colombo Family boss if ordered to do so by Carmine Persico, and that Orena professed that he would step aside as acting boss if directed to do so by Persico.

Thus, Orena has failed to meet the "heavy burden" placed upon a defendant challenging the sufficiency of the evidence supporting his criminal conviction. *See, e.g., United States v. Concepcion*, 983 F.2d 369, 382 (2d Cir.

pose. *See* 18 U.S.C. § 1959(a)(5).

1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *United States v. Skowronski,* 968 F.2d 242, 247 (2d Cir.1992); *United States v. Macklin,* 927 F.2d 1272, 1277 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 146, 116 L.Ed.2d 112 (1991). Rather, the evidence adequately established that the Colombo Family members remained "associated together for a common purpose," *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528; *see also Coonan,* 938 F.2d at 1559–60, even after the conflict between the Orena and Persico factions erupted.

3. *The Admission of Coconspirator Testimony.*

Orena contends that the "confusion in the indictment over 'enterprise'" led to erroneous and prejudicial rulings with respect to the admission of coconspirator testimony pursuant to Fed.R.Evid. 801(d)(2)(E). Rule 801(d)(2)(E) provides that: "A statement is not hearsay if ... [it] is offered against a party and is ... a statement made by a coconspirator of a party during the course and in furtherance of the conspiracy."

 In order to admit evidence pursuant to Rule 801(d)(2)(E), the district court must find by a preponderance of the evidence "that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987) (quoting Rule 801(d)(2)(E)); *see also Amato,* 15 F.3d at 234; *United States v. Cota,* 953 F.2d 753, 758 (2d Cir.1992); *United States v. Maldonado–Rivera,* 922 F.2d 934, 958–59 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 1233, 111 S.Ct. 2811, 2858, 115 L.Ed.2d 984, 1025, 1026 (1991). We review the district court's findings on these issues for clear error. *See Bourjaily,* 483 U.S. at 181, 107 S.Ct. at 2781–82; *Maldonado–Rivera,* 922 F.2d at 959. Further, the improper admission of such testimony is subject to harmless error analysis. *See United States v. Rivera,* 22 F.3d 430, 436 (2d Cir.1994).

 The evidence at trial established that Persico faction members unsuccessfully attempted to assassinate Orena in June 1991, and this was regarded as the beginning of the "war" between the Orena and Persico factions. Ambrosino was the first Persico faction witness to testify at trial. Before he testified, Orena raised the issue that in determining the application of Rule 801(d)(2)(E), Persico faction members could not be regarded as coconspirators of Orena after the outbreak of the struggle for control in June 1991.

Judge Weinstein ruled that the main conspiracy regarding the overall affairs of the Colombo Family continued after that date. He also decided, however, that Ambrosino would not be allowed to testify regarding a statement made to Ambrosino after June 1991 by Carmine Sessa, a Persico confederate, that related assertions made by Orena to Sessa concerning Orena's involvement in Ocera's murder. The testimony was excluded pursuant to Fed.R.Evid. 403, which authorizes the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." The government points out that Judge Weinstein made numerous rulings thereafter, consistently applying Rule 403 in Orena's favor, that barred members of the Persico faction from testifying on the basis of information provided to them by other Persico loyalists after June 1991, rather than on the basis of the witnesses' direct knowledge.

Orena contends that the district court (1) departed from this standard and allowed testimony that should have been excluded under Rule 801(d)(2)(E), and (2) provided confusing instructions to the jury on the issue. We are not persuaded by either claim.

Orena takes exception to the admission of tape recordings of conversations in Ambrosino's car that occurred on June 9 and 10, 1991. Their admission was consistent with the district court's Rule 403 determination that Persico faction statements after June 1991 would be excluded. Orena also claims that the district court improperly allowed Ambrosino to testify that Sessa had told Ambrosino that Sessa had received word that he and another Persico loyalist were to be killed at an induction ceremony. Again, this conversation occurred on June 20, 1991, and

was accordingly admitted in compliance with Judge Weinstein's original ruling.

■Orena also complains that Ambrosino was improperly allowed to testify, on the basis of statements made to him by Sessa after June 1991, that Orena had wanted Ambrosino to participate in the murder of Ocera. Ambrosino had initially testified, on the basis of a considerably earlier and concededly admissible conversation with Sessa, that Sessa had been deputized by Orena to solicit Ambrosino to commit a murder, without specifying the victim. The subsequent testimony identified Ocera as the victim.

Orena objected to the identification testimony on the basis that Sessa could only have learned this information from Orena. Judge Weinstein concluded that the two conversations with Sessa were separated by "a period of years and [Ambrosino] may have had many other sources for the information than the one you attribute the information to." He therefore allowed the testimony that identified Ocera as the murder victim, but gave the jury a cautionary instruction which emphasized that Sessa, the source of Ambrosino's testimony, was not available to be cross-examined.

It seems to us that the admission of this testimony was objectionable as inconsistent with Judge Weinstein's initial ruling concerning post–June 1991 statements by members of the Persico faction, however and whenever Sessa acquired the information that Ocera was the intended murder victim. If Sessa was no longer to be regarded as Orena's coconspirator, then testimony that was based upon statements by Sessa would be inadmissible, whatever the source of his knowledge regarding those statements.

In any event, in the immediate aftermath of this testimony by Ambrosino, Orena pointed out to the court that the source of Sessa's knowledge on this matter was Orena, and requested an instruction striking the testimony. Judge Weinstein acceded to that request, and with Orena's acquiescence and apparent approval, delivered the following instruction to the jury:

> From time to time, I've mentioned hearsay to you. If anything that this witness says is based upon what someone outside the courtroom told him, after July of 1991, about this defendant, that is hearsay that shouldn't be used, because at that point this witness was in an effective conflict with the defendant.
>
> But before the war—so-called war that existed—that ruling does not apply.

■ Orena also challenges Judge Weinstein's admission, pursuant to Fed.R.Evid. 803(24),[3] of hearsay testimony regarding the outbreak of the shooting phase of the Orena–Persico conflict in November 1991, contending that the invocation of Rule 803(24) simply sidestepped the requirements of Rule 801(d)(2)(E). Judge Weinstein concluded that the testimony "provided great assurance of verity because these people were in the middle of a life and death battle and now they are being told about life and death battle elements." He also reviewed the other requirements of Rule 803(24), *see supra* note 3, and concluded that they had been satisfied. He did not abuse his discretion in admitting this evidence.

■ Orena contends that it was error to admit testimony by D'Arco and Gravano pursuant to Rule 801(d)(2)(E) that related to an overarching conspiracy between the Colombo Family and other families represented on the

---

**3.** Rule 803(24) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(24) **Other exceptions.** A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Commission, and that the district court also erred when, in connection with that testimony, he commented:

> These gangs in order to operate properly must be fully informed of each other's activities. As part of the action in encouraging the interrelationship among the gangs and members of the gangs, a certain amount of this conversation is required.... It's very important in keeping up the morale of the group and in insuring that all the members of the group feel important and feel that they're protected in an ongoing conspiracy.

The conspiracy to which Rule 801(d)(2)(E) has reference with respect to particular testimony need not be identical to the conspiracy charged in the indictment, *see United States v. Gotti,* 644 F.Supp. 370, 374 (E.D.N.Y.1986) (collecting cases), and there was ample evidence to support the existence of a conspiracy embracing the Colombo Family and other families represented on the Commission. *Cf. Salerno,* 868 F.2d at 528 (finding Colombo family represented on Commission, and that Commission superintends and regulates affairs of the five Cosa Nostra families in New York City and affiliated families in other cities). Further, *Maldonado–Rivera* holds that Rule 801(d)(2)(E) encompasses statements that "serve to foster trust and cohesiveness [among coconspirators], or inform each other as to the progress or status of the conspiracy." 922 F.2d at 959. Judge Weinstein's comment falls squarely within the rationale of *Maldonado–Rivera.* In any event, it was made at a side bar conference beyond the hearing of the jury.

 Orena's claims of instructional error fare no better. Orena points to the following instruction, in the course of Ambrosino's testimony, in which Judge Weinstein addressed the general question of single and multiple conspiracies, stating:

> [I]f they were all in one conspiracy at the time, ... and the statements were being made to help the conspiracy, then any of them can talk for anybody else.
>
> But if they were separate conspiracies, then it's something different. They might have been talking for their own purposes

and not to aid another conspiracy as charged.

> Because I'm saying conspiracies and Colombo conspiracy doesn't mean that I decided that there is such a conspiracy or conspiracies. That's for you to decide. But I think that you have to have a lot of this detail, hearsay, which may or may not be directly related, so that you can understand the total picture and how these individual witnesses fit[ ] into that total picture with their bias, ... why they are saying what they are saying now, what they did, and so on.
>
> It's very hard to disentangle all of these relationships in connection with evidence, and therefore, I'm erring on the side of allowing you to hear the evidence on a total picture.

 Taken in isolation, and without regard to other rulings by Judge Weinstein that sharply restricted the admission of post-June 1991 coconspirator testimony, the instruction might give rise to concern. The instruction emphasized, however, that the ultimate determination of the conspiracy issues was to be made by the jury. Further, there has been no showing that improper hearsay was admitted pursuant to this instruction, and accordingly no demonstration of prejudice to Orena. We will not reverse a conviction on the grounds of faulty jury instructions unless the defendant demonstrates prejudice. *See Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir.1994); *Locascio,* 6 F.3d at 939; *United States v. Pujana–Mena,* 949 F.2d 24, 27 (2d Cir.1991).

Finally, Orena also takes issue with the corrective instruction (quoted earlier in this opinion) that the district court gave, at Orena's request, to strike Ambrosino's testimony regarding Orena's identification of Ocera as a targetted murder victim. This argument is plainly frivolous.

**B.** *The Conspiracy to Murder and Murder Charges.*

**1.** *The Overt Act Requirement.*

 The murder conspiracy counts (as well as the cognate racketeering acts under the RICO count) charged Orena with con-

spiracy to murder (1) Ocera and (2) members of the Persico faction "in violation of New York Penal Law Sections 125.25 and 105.15." Although these counts were charged as direct violations of 18 U.S.C. § 1959(a)(5), which does not contain an overt act requirement, Orena contends that the indictment was fatally defective with respect to these counts because N.Y. Penal Law § 105.20, which must be read in conjunction with § 105.15, requires an overt act to be "alleged and proved" to sustain a conspiracy conviction.[4] *See People v. Keiffer,* 149 A.D.2d 974, 974, 543 N.Y.S.2d 346, 346 (4th Dep't 1989) (mem.) (reversing conspiracy conviction because indictment failed to allege overt act); *People v. Russo,* 57 A.D.2d 578, 578, 393 N.Y.S.2d 435, 436 (2d Dep't 1977) (mem.) (same).

As previously noted, Fed. R.Crim.P. 12(b)(2) requires that a defendant raise most "[d]efenses and objections based on defects in the indictment" prior to trial. *See also United States v. Wexler,* 621 F.2d 1218, 1226 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980). Orena failed to raise this issue prior to trial, and thus failed to preserve it for appeal. Accordingly, the indictment will be deemed sufficient " 'unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant [wa]s convicted.' " *Macklin,* 927 F.2d at 1276 (quoting 1 Charles Wright, *Federal Practice and Procedure* § 123, at 354–55 (2d ed. 1982)) (alteration added).

The murder conspiracy counts of the indictment charged all the elements of the *federal* statute whose violation was alleged, § 1959(a)(5), and Orena does not contend otherwise. Further, only a "generic definition" of an underlying state crime is required in a RICO indictment, as distinguished from "the elements of the penal codes of the various states where acts of racketeering occurred." *United States v. Bagaric,* 706 F.2d 42, 62 (2d Cir.), *cert. denied,* 464 U.S. 840,

917, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *see also United States v. Friedman,* 854 F.2d 535, 582 n. 11 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); *United States v. Dellacroce,* 625 F.Supp. 1387, 1391 (E.D.N.Y.1986) ("Even if proof of an overt act is required, the RICO statute does not incorporate state rules of pleading."); *cf. United States v. Giampa,* No. S 92 Cr. 437 (PKL), 1992 WL 322028, at *3 (S.D.N.Y. Oct. 29, 1992) (allegation of RICO predicate act need not specify title and section of state law that is violated); Fed. R.Crim.P. 7(c)(3) (error in or omission of citation provides no basis for relief unless prejudice shown). Thus, the failure to charge an overt act in the murder conspiracy counts of Orena's indictment was waived by failure to raise the issue prior to trial, and in any event was not error.

## 2. *The Identity of the Intended Victims.*

Orena argues that the count in the indictment which charged a conspiracy "to murder members of the Persico faction of the Colombo Family" failed to identify the intended victims, and therefore was fatally defective. Prior to trial, Orena requested a bill of particulars pursuant to Fed.R.Crim.P. 7(f), and included a request for the identity of the Persico murder targets. The government response identified twelve intended victims, but added the phrase "and others" at the end of the list to indicate that there might be others not then known to the government. Orena did not make any further request for particulars on this issue, and thus failed to preserve it for appeal. *Cf. Macklin,* 927 F.2d at 1276.

In any event, we perceive no deficiency in the prosecution's response. The government provided all the information that was available to it. *Cf. United States v. Bennett,* 36 F.R.D. 103, 104 (E.D.S.C.1964) ("An indictment should name, as was done here, the persons defrauded when they are known by

---

4. We reject without extended discussion Orena's argument that the murder and murder conspiracy counts of the indictment were defective because they failed to specify the type of murder (*i.e.,* intentional, depraved indifference, or felony-murder) under N.Y.Penal L. § 125.25 that was charged. Fairly read, all of these counts clearly charge intentional murder. Indeed, a conspiracy charge, or a murder charge that is accompanied by a parallel murder conspiracy charge, obviously contemplates intentional murder.

the government."). Orena had adequate notice of the charge against him to prepare a defense on this murder conspiracy count.

## C. *Admission of the Firearms and Loansharking Records.*

■ Orena objects to the admission of firearms recovered beneath the wooden deck in the back yard of the house where he was arrested. Although the house was not his own, he resided there and was surveilled regularly entering and exiting the home. Judge Weinstein found that the protection afforded Orena by his position in the Colombo Family made it unlikely that someone other than Orena would store anything on the property, and admitted the guns in evidence. Orena claims that the firearms "were not sufficiently connected to [Orena]."

■ "Proof of the connection of an exhibit to the defendants may be made by circumstantial evidence. And the prosecution need only prove a rational basis from which to conclude that the exhibit did, in fact, belong to the appellant[ ]." *United States v. Mendel,* 746 F.2d 155, 167 (2d Cir.1984) (citations omitted), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); *see also United States v. Natale,* 526 F.2d 1160, 1173 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). A trial judge has broad discretion to determine whether an exhibit has been authenticated properly. *See United States v. Ruggiero,* 928 F.2d 1289, 1303–04 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991); *Mendel,* 746 F.2d at 167.

The district court did not abuse its discretion in admitting the firearms found under the wooden deck. As the court concluded, it was unlikely that a stranger would "dare" stash firearms on the property while Orena was residing there. Moreover, this case involved mob-related warfare, and the evidence at issue is a bag of guns retrieved from the residence of a Mafia leader. At a minimum, it was rational to conclude that the firearms belonged to Orena or were under his control.

■ Orena also challenges the admission in evidence of firearms and related apparatus that was seized from other Colombo Family members and associates, stressing the obvious but irrelevant point that these guns did not belong to Orena. The government charged in the indictment, and therefore undertook to prove, that a war broke out between the Orena and Persico factions of the Colombo Family. Weapons seized from the combatants were relevant to that proposition.

■ Orena also objects to the admission of loansharking records that had been seized from Ocera's restaurant and from an apartment used by two Orena faction associates, Christopher Barnett and John Cerbone. In our view, however, these records were properly admitted as coconspirator statements because they were made by members of a loansharking conspiracy of which Orena was also a member during the course and in furtherance of the conspiracy. *See* Fed. R.Evid. 801(d)(2)(E); *Bourjaily,* 483 U.S. at 175–76, 107 S.Ct. at 2778.

Judge Weinstein's visual inspection of the Ocera records—which included names and numbers with notations such as "collect," "paid," and "balance"—revealed that they were loansharking records. Additional evidence established that Ocera and Orena belonged to the Colombo Family and engaged in loansharking. Moreover, Orena and Ocera met regularly to discuss Colombo Family business at Ocera's restaurant (where the Ocera records were seized). *Cf. Amato,* 15 F.3d at 234–35 (approving admission of Ocera loanshark records at Amato's trial). Similarly, the Barnett–Cerbone records were adequately authenticated and linked to Orena, who was the head of the Colombo Family loansharking operations. *Cf. United States v. Vanwort,* 887 F.2d 375, 388 (2d Cir.1989) (printout of computer disk seized from office of coconspirator admissible), *cert. denied,* 495 U.S. 906, 910, 110 S.Ct. 1927, 1936, 109 L.Ed.2d 290, 299 (1990); *United States v. Jaramillo–Montoya,* 834 F.2d 276, 278–79 (2d Cir.1987) (pages from address book of coconspirator admissible), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988).

## D. *Exclusion of Prosecutorial Opening Statement at Another Trial.*

■ Orena asserts that the prosecution proffered a theory of Ocera's murder at this

trial that was inconsistent with the theory put forth by the government at the prior trial of Colombo Family associate Harry Bonfiglio, who was charged with Ocera's murder. Orena contends that he was therefore entitled to put in evidence the government's opening statement from the Bonfiglio trial, and that its exclusion constituted reversible error.

■ The defense is allowed to introduce a prosecutor's statement from a prior trial when: (1) the prosecution offered an inconsistent assertion of fact at the prior trial; and (2) the prosecution can offer no "innocent" explanation for the contradiction. *See United States v. Salerno,* 937 F.2d 797, 811 (2d Cir.1991), *rev'd on other grounds,* —— U.S. ——, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992); *United States v. GAF Corp.,* 928 F.2d 1253, 1262 (2d Cir.1991); *United States v. McKeon,* 738 F.2d 26, 32–33 (2d Cir.1984). The prosecution's theories at the Orena and Bonfiglio trials, however, were not contradictory.

At Bonfiglio's trial, the prosecution postulated that Ocera was murdered because he was skimming loansharking proceeds. At Orena's trial, the prosecution proffered three bases for Ocera's murder: (1) Ocera was skimming loansharking proceeds; (2) Ocera had not been able to retrieve the loansharking records seized from his restaurant by the Suffolk County police; and (3) Orena wanted to ingratiate himself with John Gotti, then the boss of the Gambino family, who for his own reasons wanted Ocera to be killed. Thus, the prosecution at Orena's trial offered additional, not conflicting, theories for the Ocera murder. Further, there is no showing that evidence was introduced at the Bonfiglio trial that would have justified arguing the additional theories to the jury in that case. Accordingly, the district court properly excluded the prosecution's opening statement at Bonfiglio's trial from being admitted in evidence at Orena's trial.

5. Orena's brief "adopt[ed] the arguments advanced in this Court by defendant-appellant Pasquale Amato ... that the district court's joint sentencing memorandum and order violated the directive that only information specific to the

### E. *The Imposition of Fines, Including the Costs of Incarceration.*

■ Judge Weinstein issued a joint sentencing memorandum regarding Orena, Amato, and Michael Sessa in which, *inter alia,* he imposed a $2.25 million fine on Orena ($250,000 for each count). The decision to impose fines upon all the defendants was based upon Judge Weinstein's conclusion that:

> The proof relating to defendants' lifelong involvement in lending funds at annual rates of interest greatly exceeding 100 percent establishes beyond a reasonable doubt that they are concealing significant assets. The limited financial information gleaned by Probation undoubtedly underrepresents greatly the monies that defendants have squirrelled away. They must reimburse society for the drain on economic resources caused by their lives of crime and for the high costs of their own necessary imprisonment.

We have already ruled in *Amato* that evidence of lucrative illegal activity can support a judge's finding that a defendant is able to pay a fine levied against him. *See* 15 F.3d at 237. In this case, the evidence at trial established that Orena was the head of a profitable loansharking operation for a number of years, and thus supported the imposition of a severe fine. Moreover, Orena bore the burden of establishing his inability to pay the fine, *see id.;* U.S.S.G. § 5E1.2(a), and has offered only conclusory allegations that he is unable to pay the fine that was imposed. The district court found otherwise based upon the evidence in this case, and we affirm its ruling.[5]

■ We also affirm the imposition of the costs of incarceration ($1,492 per month) upon Orena. Orena cites *United States v. Spiropoulos,* 976 F.2d 155, 164–69 (3d Cir. 1992), for the proposition that the district court lacked authority to impose a fine requiring payment of the costs of incarceration. Three circuits have come to the opposite

particular defendant be considered. 18 U.S.C. § 3553(a)." We rejected this argument in *Amato,* and we do so here for the reasons stated in that opinion. *See* 15 F.3d at 237.

conclusion. *See United States v. Turner,* 998 F.2d 534, 536–37 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 639, 126 L.Ed.2d 598 (1993); *United States v. Hagmann,* 950 F.2d 175, 186–87 (5th Cir.1991), *cert. denied,* —— U.S. ——, ——, 113 S.Ct. 108, 485, 121 L.Ed.2d 66, 389 (1992); *United States v. Doyan,* 909 F.2d 412, 415–16 (10th Cir.1990). Further, the Sentencing Guidelines explicitly authorize such a fine, U.S.S.G. § 5E1.2(i), and we have affirmed a fine that included such a component. *See United States v. Carter,* 978 F.2d 817, 819–20 (2d Cir.1992). We therefore decline to follow *Spiropoulos,* and affirm the fine imposing the costs of incarceration upon Orena.

### F. *The Motion for a New Trial.*

■ Subsequent to his conviction and sentencing, Orena moved for a new trial premised upon alleged prosecutorial misconduct. He claimed that the government presented testimony that it knew or should have known was false and misleading, and relied upon that false testimony in its closing argument. He also claims that the government failed to disclose exculpatory evidence to him. The district court denied Orena's motion, and he renews these contentions on this consolidated appeal.

The assertedly false testimony at Orena's trial was provided by Gravano. In a subsequent trial of Pasquale Conte, the government sought to detain Conte without bail, and represented in that connection that Gravano would testify that he had approached Conte in behalf of John Gotti, then Gravano's boss, to ascertain whether Gotti could share in the proceeds of Conte's narcotics trafficking. Orena contends that this information contradicted Gravano's testimony at Orena's trial that the Mafia forbade drug trafficking, and should have been disclosed to Orena by the government.

Montesano testified at Orena's trial that in a discussion at Ocera's restaurant, Orena had evidenced to her that he was aware of an attempted ambush of Ocera the night preceding the discussion. When she later testified at Amato's trial, however, she made it clear that Orena's knowledge of the incident probably resulted from Ocera's describing it to Orena prior to Orena's discussion with Montesano. Again, Orena claims that this exculpatory evidence was improperly withheld from him.

■ Only prosecutorial conduct "so severe and significant as to result in the denial of ... a fair trial" will lead to reversal. *Locascio,* 6 F.3d at 945. No showing has been made that satisfies this demanding standard. Both at Orena's trial and at previous trials, Gravano had testified that the Mafia "rule" against drug trafficking was honored more in the breach than the observance. As Judge Weinstein correctly concluded, disclosure of Gravano's dealings with Conte would not significantly have improved Orena's ability to undercut Gravano's credibility, especially in light of the independent availability to Orena of ample evidence (which was presented to the jury) of Gravano's horrendous history of criminal activity. *Cf. Locascio,* 6 F.3d at 948–50 (affirming denial of motion for new trial based upon additional incriminatory information regarding Gravano); *United States v. Gambino,* 835 F.Supp. 74, 85–91 (E.D.N.Y.1993) (denying motion for new trial based upon subsequent inconsistent testimony by Gravano regarding his involvement in narcotics trafficking).

As to Montesano, Orena simply assumes that the government was aware of the clarifying testimony that she would subsequently provide at the Amato trial. The government denied such knowledge, Judge Weinstein credited that denial, and we have no basis to reach any different conclusion. In any event, we perceive no likelihood that alteration of Montesano's trial testimony to conform to her later testimony at the Amato trial would have changed the outcome of the Orena trial.

### Conclusion

We affirm the judgment of conviction and the order that denied Orena's motion for a new trial.